# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **CHRISTOPHER WEST**, *et al.*, | ) |
| | ) Case No. 08 CR 669 |
| Petitioners, | ) |
| | ) |
| v. | ) Judge David H. Coar |
| | ) |
| **UNITED STATES OF AMERICA**, | ) Magistrate Judge |
| | ) Martin C. Ashman |
| Respondent. | ) |

## MEMORANDUM OPINION AND ORDER

The Government of the United States of America ("the Government") indicted, among others, John Ramin ("John") and Tahir Ramin ("Tahir" or "Tahir Ramin") (collectively "Defendants") on charges of conspiracy to commit bribery under 18 U.S.C. § 371, conspiracy to commit mail fraud under 18 U.S.C. § 1349, and bribery of public officials under 18 U.S.C. §§ 201(b)(1)(A)–(C). Currently before this Court is Defendants' Supplemental Motion for Disclosure of All Transcripts of Grand Jury Proceedings Supporting the Government's Initial and Superseding Indictments ("Defendants' Motion" or "Motion") (Dckt. 372). This Court rules on this Motion under Judge David H. Coar's referral of this Motion pursuant to Local Rule 72.1. For the reasons stated below, the Court grants Defendants' Motion in part and denies it in part.

### I. Background

John and Tahir were contractors in Afghanistan whom the Government has alleged engaged in bribery, conspiracy, and mail fraud. (Superceding Indictment ¶¶ 4, 8, 27, 70, 107,

110.) Among the others charged in the superceding indictment was Christopher West ("West"), an Army Major with the Illinois National Guard 33d Areas Support Group, who was deployed at Bagram Airfield ("Bagram") in Afghanistan.[1] (*Id.* at ¶ 1.) At Bagram, West had various duties, including acquiring bunkers and barriers to be used on the airfield. (*Id.* at ¶ 2.)

As to the charges against the Ramins, the Government indicted them based on acts occurring in two different time periods. According to the superceding indictment, the first occurred between September and November of 2004, when John and Tahir allegedly paid $30,000.00 to West (and others) in return for the award of a bunkers and barriers contract. (*Id.* at 27.) The second act or series of acts took place between July 2004 and January 2005. (*Id.* at 30.) The Government alleges that, during this time, Tahir and John fraudulently inflated the number of bunkers and barriers delivered to Bagram, resulting in overpayments from which John and Tahir profited.[2] (*Id.*) The charges of mail fraud and conspiracy to commit bribery involve facts relating to these incidents. (*See id.* at 8–25, 70–106, 110–19.)

This Motion concerns the testimony given at the grand jury proceedings related to the indictments of Defendants. Specifically, it relates to the testimony of Special Agent Thomas Fikes ("Agent Fikes"), who arrested and interrogated Tahir Ramin at O'Hare International Airport on August 25, 2008. (Defs.' Supp. Mot. For Disclosure of All Transcripts of Grand Jury Proceedings Supporting the Government's Initial and Superseding Indictments ("Defs.' Mot.") 2.) Also present at this interrogation was Defense Criminal Investigative Service Special Agent Gary

---

[1] West has since pled guilty to certain crimes.

[2] Other "uncharged misconduct" remains at issue but is not the subject of this Motion. (Defs.' Resp. 2.)

DeMartino ("Agent DeMartino"), who recorded notes and prepared a written report of the interview. (*Id.*; Government's Resp. 3.) The district judge previously granted Defendants' Motion for Disclosure of Transcripts of Grand Jury Proceedings Supporting the June 18, 2009, Superseding Indictment, which ordered the disclosure of Agent Fikes' testimony before the grand jury on June 18, 2009. (Defs.' Mot. 1.) The Government complied with that order. (*Id.*)

This disclosure revealed that Agent Fikes testified to the grand jury about the arrest and interrogation of Tahir. (*See generally* Fikes Dep. June 19, 2009.) In describing the alleged extortion scheme occurring at Bagram, Fikes stated that Tahir Ramin was the owner of AZ Corporation, and that he talked specifically about a scheme to inflate the number of bunkers and barriers delivered to Bagram. (Fikes Dep. 5.) Specifically, he explained the arrangements he and his brother (John) had with West and Lieutenant Moore ("Moore"), and how they would pay Moore and West to inflate the number of bunkers delivered. (*Id.*) Then Fikes explained how Moore and West profited from this scheme.

> A. Well, obviously, as I said earlier, there was a predetermined price for each of the bunkers or barriers. That included the cost of the materials to make them as well as the profit for the company. So that overall price was for each individual barrier.
> So what they did is they inflated the numbers; for example, they would, instead of delivering 20 [*sic*] – on an order of 25, they would deliver only 20, so that there were five more that did not exist; but they would get signed off on as having delivered 25 barriers. So those five non-existent barriers would be paid out ultimately off of the invoice, and that would be a hundred percent profit, so that the contractor - the agreement was the contractor would split that profit fifty-fifty with the operations of West and Moore.
>
> Q. So West and Moore were aware that the invoices were inflated?
>
> A. Correct.

> Q. And they would have to be aware, right, because they would – they would see the bunkers and barriers coming onto the base?
>
> A. Right, right.

(Fikes' Dep. 18–19.) When asked how Fikes became aware of these facts, he stated that Moore and West told him about them, and that "Tahir Ramin discussed [them] in his interview." (*Id.* at 20.) He said that each individual "told substantially the same . . . [story]." (*Id.*)

Later in the deposition, agent Fikes testified to Tahir's involvement in the scheme:

> Q. When you spoke with Tahir Ramin and he explained to you, you said that he knew about this inflation scheme, that he had been part of it, did he tell you that he had delivered payment to West and Moore?
>
> A. He talked in somewhat general terms. He a – the payments were made by he and his brother.
>
> Q. His brother, John Ramin?
>
> A. Yeah. His brother directed them, I think was more or less the context of how he put it.
>
> Q. Did he tell you that he was aware that other contractors were doing the same thing?
>
> A. Yes. Like I said earlier, the contractor community, they generally knew each other and what each was doing and they discussed it.
> In this case, he was the first person to tell us that the bunkers and barriers contractors actually had gotten together and discussed the situation as far as, you know, the fact that they were making arrangements with the operations office and they wanted to come to an agreement as to what a good bunkers and barriers price would be.

(Fikes Dep. 28.) As noted above, Agent DeMartino took notes and wrote a report concerning the interview. While neither party provided the Court with a copy of either document, Defendants' Motion explains—and the Government does not dispute—that Agent DeMartino's notes "indicate

that Tahir Ramin and AZ 'delivered all the barr[iers] on the call sheet,' and that other local contractors, though they failed to deliver the required number of barriers, were nevertheless paid as though they had." (Defs.' Mot. 2.) Agent DeMartino's notes apparently also state that "Tahir Ramin said, 'Everyone (EHCO, NBE, NRO) else inflatted [*sic*] the numbers.'" (*Id.*)

On October 9, 2009, the district judge held a suppression hearing. (Government's Resp. 3.) At that hearing, Agents Fikes and DeMartino testified. (*Id.*) Agent Fikes testified that he did not base his grand jury testimony on Agent DeMartino's report of the interview. (*Id.*) Instead, he said the "source" of his information was Tahir Ramin. (*Id.*) He confirmed that Tahir Ramin admitted to participation in the bunkers-and-barriers scheme. (*Id.* at 4.) Fikes stated that he didn't mention—as Agent DeMartino's notes reflected—that Tahir claimed he delivered all the barriers on the order form because Tahir initially denied knowledge of the scheme, but then became more forthcoming about his participation. (*Id.* at 4–5.) Agent DeMartino testified similarly: initially Tahir claimed he was aware of the scheme but did not participate, but then admitted to doing so. (*Id.* at 5–6.) Defendants brought the current Motion to disclose grand jury testimony because, they argue, Agent Fikes may have committed perjury during the grand jury proceedings. (*See generally* Defs.' Mot.) They also claim that the grand jury was entitled to hear how, allegedly, Defendants were victims of "extortion." (*Id.* at 6.)

## II. **Discussion**

Grand jury proceedings are secret by nature—and for important purposes. *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 399–400 (1959); *United States v. Puglia*, 8 F.3d 478, 479 (7th Cir. 1993). Among other things, secrecy ensures that prospective witnesses come

forward voluntarily; that one who testifies before a grand jury does not fear reprisal and, therefore, testifies "fully and frankly"; that the indicted does not flee (because he is not aware of the indictment) or "try to influence individual grand jurors to vote against the indictment"; and that individuals exonerated by the grand jury are not publicly ridiculed. *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 424 (1983).

Nevertheless, the veil of secrecy is not immovable. Federal Rule of Criminal Procedure 6(e)(3)(E)(ii) provides that "[t]he court may authorize disclosure—at a time, in a manner, and subject to any other conditions that it directs—of a grand-jury matter[] . . . at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." The burden is on the defendant to show a "compelling necessity," *United States v. Lisinski*, 728 F.2d 887, 892 (7th Cir. 1984), or a "particularized need" for the grand jury testimony that outweighs the policy of secrecy. *Pittsburgh Plate Glass*, 360 U.S. at 400. By its text, Rule 6(e)(3)(E)(ii) commands that the "particularized need" be tied to the defendant's showing that "a ground may exist to dismiss the indictment" because of conduct that occurred before the grand jury. The burden, though, works on a sliding scale: as secrecy considerations become less relevant, so too does the burden lessen. *Douglas Oil Co. of Cal. v. Petrol Stops Northwest*, 441 U.S. 221, 223 (1979). The trial judge has significant discretion when deciding the disclosure question. *Lisinski*, 728 F.2d at 893.

Before moving into the analysis, there remains a question of the import of *Douglas Oil*, which both parties cite. *Douglas* laid out a three-factor test to determine whether "the traditional secrecy of the grand jury may be broken." 441 U.S. at 222. The party seeking material must show that the material "is needed to avoid a possible injustice in *another* judicial proceeding, that the

need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." *Id.* (emphasis added). *Douglas* concerned disclosure of grand jury materials in *a separate* proceeding; i.e., not the original criminal proceeding for which the grand jury convened. 441 U.S. at 213. Thus, the rule at issue there was not, as it is here, Rule 6(e)(3)(E)(ii). The difference is that, in this case, Defendants have requested the grand jury testimony for a very specific reason: grounds for dismissal of the indictment may exist based on certain testimony given by a witness.

This *Douglas* test, then, does not fit neatly into the framework of Rule 6(e)(3)(E)(ii).[3] The first factor (i.e., would prejudice result?) is replaced by the Rule's command (i.e., has the defendant shown that grounds may exist to dismiss the indictment?). Nonetheless, the latter two components are relevant, as the Supreme Court and the Seventh Circuit have essentially endorsed both under Rule 6(e)(3)(E)(ii). *See Pittsburgh Plate Glass*, 360 U.S. at 400–01 (noting that the "particularized need" must "outweigh[] the policy of secrecy" and affirming the trial court's denial of disclosure based on the "breath of petitioners' claim" for documents); *id.* at 399 (explaining that "'the secrecy of the [grand jury] proceedings [can be] lifted discreetly and limitedly'" (quoting *United States v. Procter & Gamble*, 356 U.S. 677, 683 (1958) (emphasis added)); *Lisinski*, 728 F.2d at 893–94 (stating, under the former Rule 6(e)(3)(C)(ii), that the court must "'[weigh] the need for secrecy against the need for disclosure of *specified* documents and testimony occurring before the grand jury'" (quoting *Douglas Oil*, 441 U.S. at 222–23 (emphasis added)). The Rule itself also gives the court broad discretion (in how and when) to lift the veil of

---

[3] One district court recently took the opposite approach and adopted the *Douglas Oil* test wholesale in a case where Rule 6(E)(3)(e)(ii) was at issue. *U.S. v. Jefferson*, No. 09-7, 2009 WL 4549151, at *4–6 (E.D. Wis. Nov. 27, 2009).

secrecy. FED. R. CRIM. P. 6(E)(3)(e)(ii) (stating that "[t]he court may authorize disclosure—*at a time, in a manner, and subject to any other conditions that it directs*—of a grand-jury matter") (emphasis added).

With these considerations in mind, two relevant questions arise: Did the defendants meet the burden of particularized need by showing that grounds may exist to dismiss the indictment? If so, does this need—when coupled with the type and amount of materials requested—outweigh the long-established policy of secrecy in grand jury proceedings? If the answer to both of those questions is "yes," then the court should grant the defendant's request for disclosure.[4]

As to the first question, the Court finds that Defendants have shown that a ground may exist to dismiss the indictment. Courts finding that a defendant did not satisfy this requirement have done so where the defendant failed to present evidence supporting his claim. *Lisinski*, 728 F.2d at 894 (finding no particularized need where "[the defendant] proffer[ed] an unsupported speculation that, possibly, insufficient evidence was presented to the grand jury to sustain the indictment"); *United States v. Edelson*, 581 F.2d 1290, 1291 (7th Cir. 1978) (finding no particularized need because the defendant offered "nothing more than unsupported speculation," failing to "[point] to anything in the record which [*sic*] might suggest that the prosecution engaged in improper conduct before the grand jury"); *United States v. Perez*, 67 F.3d 1371, 1381 (9th Cir. 1995) (finding no particularized need where "the defendant alleged no facts in support of his claim"), *withdrawn in part and other grounds*, 116 F.3d 840 (9th Cir. 1997). Here, Defendants already have shown that there are potential inconsistencies in the statements made by

---

[4] If the answer to the first question is "no," the inquiry is over—no materials are disclosed. Nevertheless, the answer to the first question may be "yes," and the second, "not exactly," as the court may limit the request where it is overbroad. FED. R. CRIM. P. 6(E)(3)(e)(ii).

Fikes in his grand jury testimony and what Tahir Ramin may have stated during the August 25, 2009, interrogation. The answer to the first question (i.e., have Defendants met their burden?), therefore, is "yes."

Answering the second question presents a more nuanced analysis. The secrecy of the grand jury, of course, is heavy and commands strong protection. But the need for that secrecy here, unlike in *Lisinski* and *Edelson*, is somewhat diminished given that the district judge already allowed the disclosure of Fikes testimony. Additionally, the possibility exists that Defendants may obtain these materials under the Jenks Act, 18 U.S.C. § 3500 *et seq.*,[5] further lightening the veil of secrecy. Here, where the secrecy considerations are less relevant, the burden on Defendants is not as strong. *Douglas Oil*, 441 U.S. at 223. For all of these reasons, the court finds the need for secrecy does not outweigh disclosure.

That conclusion notwithstanding, the Court finds Defendants' request overbroad, as it asks for *all* grand jury materials. *Cf. Lucas v. Turner*, 725 F.2d 1095, 1108 (7th Cir. 1984) (finding overbroad a request for disclosure, in the context of a civil proceeding, where the "[p]laintiffs made *no* attempt to limit their request as they merely sought wholesale disclosure of *all* grand jury materials and then attempted to justify their needs") (emphases in original). While Defendants have satisfied the burden the law foisted upon them, they have done so only to the extent that Fikes may have perjured himself. In other words, Defendants may obtain the grand jury materials that are likely to cast light on this perjury. Therefore, the are entitled to any grand jury materials that mention any statements made by Tahir Ramin.

---

[5] The Jenks Act allows the defendant to discover testimony of a government witness, with certain limitations, after the witness testifies on direct examination at trial. 18 U.S.C. § 3500(b).

As to Defendants' request that the grand jury should have been entitled to hear testimony about the "extortion" taking place at the hands of the U.S. officials, the Court disagrees. The Government rightly points out that a grand jury need not hear any testimony on potential *defenses*, which cannot be a ground to dismiss an indictment. *U.S. v. Williams*, 504 U.S. 36, 53 (1992) ("If the grand jury has no obligation to consider all 'substantial exculpatory' evidence, we do not understand how the prosecutor can be said to have a binding obligation to present it."). That is exactly what testimony about "extorting the Rahims" would be.[6] Therefore, the court denies Defendants' Motion as to "evidence that contractors such as the Ramins were victims of an extortion scheme." (Defs.' Mot. 6.)

For those reasons, the Court orders the disclosure of any grand jury testimony that references any statement(s) made by Tahir Ramin.

### III. <u>Conclusion</u>

For the foregoing reasons, the Court grants Defendants' Motion in part and denies it in part. (Dckt. 372.) The Court orders the Government to disclose any grand jury testimony that references any statement(s) made by Tahir Ramin within ten (10) days.

---

[6] In a separate Opinion, this Court found that economic coercion could not be an affirmative or a substantive defense to bribery. (Dckt. 460.)

- 10 -

ENTER ORDER:

*[signature: Martin C. Ashman]*

———————————————————
**MARTIN C. ASHMAN**
United States Magistrate Judge

Dated: April 5, 2010.