**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 08 CR 669** |
| | ) | |
| **CHRISTOPHER P. WEST, et al.** | ) | **Hon. Matthew F. Kennelly** |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' MOTION TO DISMISS COUNTS ONE, THREE,
TEN, ELEVEN, FOURTEEN AND THE FORFEITURE COUNT
OF THE SUPERSEDING INDICTMENT**

Defendants John Ramin, Tahir Ramin, and AZ Corporation ("Defendants"), by and through their respective counsel, respectfully request that the Court dismiss Counts One, Three, Ten, Eleven, Fourteen and the Forfeiture Count of the Superseding Indictment. (Docket No. 201.) In support of this Motion, Defendants state as follows:

**I.      INTRODUCTION**

Counts One, Three, Ten, Eleven, Fourteen and the Forfeiture Count of the Superseding Indictment charge Tahir Ramin, John Ramin, and AZ Corporation, together or in various combinations, with participating in a scheme to bribe co-defendant Army Major Christopher West and other military personnel in order to obtain a contract for bunkers and barriers and/or to falsely inflate the number of bunkers and barriers that would be delivered to the military by AZ.

To secure the Superseding Indictment, the case agent, United States Army Criminal Investigation Division ("CID") Special Agent Thomas Fikes, described defendant Tahir Ramin's post-arrest statement during testimony before the grand jury. In his grand jury testimony, Fikes characterized Tahir's statements as though he had *confessed during the post-arrest interview*. In fact, the contemporaneous notes taken by a fellow CID agent state that Tahir *denied* participating in the so-called bunker and barrier inflation scheme. Agent Fikes's grand jury testimony

transformed that denial about the so-called bunkers and barriers scheme into an alleged confession, and this "confession" served as the basis for the Superseding Indictment. Magistrate Judge Ashman, in ruling on the defendant's contested motion for access to the grand jury testimony, found there to be "potential inconsistencies" between the grand jury testimony and the contemporaneous interview notes, entitling Defendants to additional disclosure to establish whether "Fikes may have perjured himself." (*See* Docket No. 464, at 8-9.)

Further, although Tahir Ramin had told the government agents during his post-arrest interrogation that military officials at Bagram Air Force base were ***extorting*** payoffs, Agent Fikes testified before the grand jury that Tahir Ramin, John Ramin and AZ Corporation were willing participants in the charged conspiracy involving bunkers and barriers. The government knew full well that extortion was occurring at Bagram, both because the Ramins had complained about Major West to military authorities well before this case was indicted, and because the government possessed secret undercover tapes in which West described himself as a "gangster" who looked for "shakedown" opportunities while running a "family" at Bagram Air Field. The government was also in possession of numerous witness interview reports in which other military officials had stated that West had "pressured" them to commit unlawful activities, and that West claimed he was responsible for numerous "beatings" and "suicides" on base. Thus, despite the fact that Tahir Ramin's post-arrest statements about Major West and those operating at his direction and under his control were not news to the government, it appears these critical facts were never presented to the grand jury in forming the decision about whether to return the Superseding Indictment.

Finally, Agent Fikes's inaccurate and misleading testimony regarding AZ's participation with the other contractors in a single overarching conspiracy was the basis for joinder of all the

contractor defendants in Counts 10 and 14. The testimony therefore greatly compounded the burdens placed on Tahir Ramin, John Ramin and AZ Corporation in defending the case.[1]

## II.  FACTUAL BACKGROUND

### A.  The Contemporaneous Notes of Tahir Ramin's Post-Arrest Interrogation

Agent Fikes was present during Tahir Ramin's interview. His co-case agent, Defense Criminal Investigative Service Special Agent Gary DeMartino, took contemporaneous notes as the interview was occurring (the "DeMartino Notes") (attached as Exhibit A). According to the DeMartino Notes, Tahir Ramin told the interrogating agents that AZ in fact had fulfilled all of its contractual obligations related to the bunkers and barriers contract. The DeMartino Notes indicate that Tahir Ramin stated that he [identified as "S" for subject] and AZ *"delivered all the barries [sic] on the call sheet."* The DeMartino Notes further indicate that other local contractors, though they failed to deliver the required number of barriers, were nevertheless paid as though they had. As recorded in the DeMartino Notes, Tahir Ramin said, "Everyone (EHCO, NBC, NRO) *else* inflatted [sic] the numbers."

Defense Criminal Investigative Service Special Agent John Todd also took notes during a segment of Tahir Ramin's post-arrest interrogation (the "Todd Notes") (attached as Exhibit B). The Todd Notes indicate that Tahir Ramin stated that military personnel acted like a "gangster," and that military officials' conduct was "like extortion." (*See* Exhibit B, at 4.)

Hence, according to the contemporaneous notes, Tahir Ramin told the interrogating agents: (i) the bunkers and barriers had been delivered; (ii) everyone "else" (the other contractors) had under-delivered; and (iii) military personnel acted like a "gangster" and engaged in conduct that was "like extortion." This was a far different characterization of Tahir Ramin's

---

[1] Via separate motion, the defendants raise multiple conspiracy issues and defects in the *Santiago* proffer.

statement than emerged in later typewritten reports and, as detailed further below, was contradictory to Agent Fikes's grand jury testimony.

### B. The Post-Arrest Written Statement of Interview

As is customary, the handwritten notes were subsequently converted to typewritten format. In the typewritten statement of interview, Agent DeMartino quoted Tahir Ramin as having said that "*everyone*" under-delivered the bunkers and barriers. (*See* DeMartino Interview Report, attached as Exhibit C, at 3.) Thus, Agent DeMartino's interview report omitted what was included in his own contemporaneous interview notes – that Tahir Ramin in fact said that everyone "*else*" had under-delivered. By omitting a single word, Tahir Ramin's exculpatory statement was turned into an alleged confession in the "official" typewritten report.

In addition, multiple versions of the "final" typewritten report, containing markedly different information, were submitted by Agent Todd, who participated in the second segment of Tahir Ramin's post-arrest interrogation. Agent Todd prepared one report dated August 29, 2008, and another dated September 19, 2009. (*See* Todd Interview Reports, attached as Exhibits D and E, respectively.) During Agent Todd's testimony at the suppression hearing held on October 9, 2009, he was unable to explain why he had prepared the September 19 report after submitting the "official" August 29 report or why certain relevant information was omitted from one draft, but not the other. (*See* Oct. 9, 2009 Hearing Trans., at 89-93, attached as Exhibit F.) For example, Agent Todd acknowledged having made a "deliberate decision" to omit statements relating to military personnel acting like a "gangster" and engaging in conduct "like extortion" from his "official" interview report. (*See id.*, at 91-93.)

### C.     Agent Fikes's Grand Jury Testimony

The government states that Agent Fikes's grand jury testimony on June 18, 2009, was the only testimony that referenced any statement made by Tahir Ramin.[2] (*See* Docket No. 488, at 3, n. 3.)  During his June 18 Testimony before the grand jury, Agent Fikes testified that Tahir Ramin spoke explicitly about his, John Ramin, and AZ's roles in the alleged bunkers and barriers scheme.  In relevant part, Agent Fikes testified as follows:

> Q.     And just as a reminder, Tahir Ramin is the owner of which company?
>
> A.     He is the owner of AZ Corporation, operations officer of AZ Corporation.
>
> Q.     And did he talk specifically about a scheme to inflate the number of bunkers and barriers delivered to Bagram Airfield?
>
> A.     He did. He talked about the arrangements that he had with Christopher West and Lieutenant Moore, he and his brother John Ramin, wherein they were paying both Moore and West in order to inflate the bunkers.
>
>     *     *     *
>
> Q.     How did Moore and West and the contractors they're working with profit from this process, personally profit from this process?
>
> A.     Well, obviously, as I said earlier, there was a predetermined price for each of the bunkers or barriers. That included the cost of the materials to make them as well as the profit for the company. So that overall price was for each individual barrier.
>
> So what they did is they inflate the numbers; for example, they would, instead of delivering 20 – on an order of 25, they would only 20 [sic], so that there were five more that exist; but they would get signed off on as 25 barriers.
>
> So those five non-existent barriers would be paid out ultimately off of the invoice, and that would be a hundred percent profit, so that the contractor – the agreement was the contractor

---

[2] Currently pending before the Court are Defendants' Joint Objections to the Magistrate's Decision Denying In Part Their Motion for Grand Jury Disclosure (Docket No. 475), which were previously taken under advisement. (*See* Docket No. 484.)

would split that profit fifty-fifty with the operations of West and Moore.

Q.      So West and Moore were aware that the invoices were inflated?

A.      Correct.

*      *      *

Q.      The information that you've just been talking about, about the arrangement with the contractors, *who told you about those facts?*

A.      *Moore did as well as Major West. Tahir Ramin discussed it in his interview.*

Q.      *And those three individuals told substantially the same sort of version of —*

A.      *The stories were substantially the same.*

(*See* June 18, 2009 Fikes Grand Jury Trans., at 5, 18-20, attached as Exhibit G.)

***

Q.      When you spoke with Tahir Ramin and he explained to you, you said that he knew about this inflation scheme, that he had been part of it, did he tell you that he had delivered payment to West and Moore?

A.      He talked in somewhat general terms. He a -- the payments were made by he and his brother.

Q.      His brother, John Ramin?

A.      Yeah. His brother directed them, I think was more or less the context of how he put it. So he hesitated to say explicitly he did it.

Q.      Did he tell you that he was aware that other contractors were doing the same thing?

A.      Yes. Like I said earlier, the contractor community, they generally knew each other and what each was doing and they discussed it. In this case, **he was the first person to tell us that the bunkers and barriers contractors actually had gotten together and discussed the situation as far as, you know, the fact that they were making arrangements with the operations office and they wanted to come to an agreement as to what a good bunkers and barriers price would be.**

(*Id.*, at 28) (emphasis added).

Thus, Agent Fikes told the grand jury that Tahir Ramin admitted in the interview that: (1) he, John Ramin, and AZ were involved in the "scheme to inflate the number of bunkers and barriers delivered to Bagram Airfield," (Ex. G, at 5); (2) he had a detailed understanding of the bunkers and barriers inflation "scheme", which he described in "substantially the same way" as Major West and Lieutenant Moore, (Ex. G, at 20); and (3) Defendants participated in a bunkers and barriers "conspiracy" with other local contractors and the corrupt military officials. (Ex. G, at 28.)   Agent Fikes' June 18, 2009 testimony directly contradicts the agent notes of Tahir Ramin's post-arrest interrogation.

## III.    ARGUMENT

### A.    Dismissal Of An Indictment Is Warranted Where Inaccurate And Misleading Testimony Before A Grand Jury Substantially Influences The Grand Jury's Decision To Indict

A district court is authorized to dismiss an indictment for errors in grand jury proceedings where those errors prejudiced the defendant. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988); *United States v. Brooks*, 125 F.3d 484, 497-98 (7th Cir. 1997).   The "focus of the prejudice inquiry should be on the effect of the alleged error on the grand jury's decision to indict. . ." *United States v. Mechanik*, 475 U.S. 66, 78 (1986) (O'Connor, J., concurring); *see also Bank of Nova Scotia*, 487 U.S. at 256. A defendant establishes the requisite prejudice where "the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia*, 487 U.S. at 256 (quoting *Mechanik*, 475 U.S. at 78); *United States v. Useni*, 516 F.3d 634, 656 (7th Cir. 2008); *United States v. Vincent*, 416 F.3d 593, 600 (7th Cir.

2005).[3] In such a case, "the violations cannot be deemed harmless." *Bank of Nova Scotia*, 487 U.S. at 263.

The Seventh Circuit has recognized a number of scenarios in which a defendant can make a showing of prejudice. A defendant may establish prejudice by showing that the allegedly inaccurate evidence influenced the grand jury's decision to indict. *Vincent*, 416 F.3d at 602. A defendant may also demonstrate prejudice by showing he was forced to defend a charge for which no reasonable cause existed to believe him guilty. *Id.* False testimony before the grand jury also justifies the dismissal of an indictment. *Useni*, 516 F.3d at 656.

For example, in *United States v. Asdrubal-Herrera*, 470 F. Supp. 939, 942 (N.D. Ill. 1979), the prosecution negligently presented false testimony that misled the grand jury into believing that the defendant, who was charged with immigration offenses, was a dealer in firearms. At the request of the federal prosecutor, an INS agent drafted the criminal complaint. The complaint, however, contained a misunderstanding of the facts surrounding the arrest. The INS agent who prepared the complaint testified before the grand jury, which voted to return the indictment. The court granted defendant's motion to dismiss, holding that the false testimony had biased the grand jury, depriving the defendant of his right to an "independent and informed" grand jury. *Id.* at 942.

Courts around the country have found that dismissal of an indictment is warranted where the defendant shows that false or misleading testimony was material to a grand jury's charging decision. *See, e.g., United States v. Basurto*, 497 F.2d 781, 784-86 (9th Cir. 1974) (conviction reversed because prosecutor informed defense counsel of perjured grand jury testimony but

---

[3] In *Bank of Nova Scotia*, the Supreme Court expressly adopted the standard of prejudice articulated by Justice O'Connor in *Mechanik*.

failed to notify court or grand jury); *see also United States v. Lawson*, 502 F. Supp. 158, 172 (D. Md. 1980) (dismissing indictment where prosecutors characterized exculpatory statements as inculpatory admissions before grand jury); *United States v. Provenzano*, 440 F. Supp. 561, 565 (S.D.N.Y. 1977) (dismissing indictments against defendant based upon false testimony of grand jury witness); *United States v. Gallo*, 394 F. Supp. 310, 315 (D. Conn. 1975) (dismissal of second indictment warranted where prosecutor failed to alert second grand jury that testimony supporting initial indictment was permeated with perjurious statements going to material events).

In sum, to justify dismissal, a defendant must establish two essential points: first, that an error was made before the grand jury that returned the indictment against the defendant(s); and second, that the error either substantially influenced the grand jury's decision to indict or cast "grave doubt" that the grand jury's decision to indict was free from the substantial influence of such errors. The Defendants establish both points here.

**B.    Agent Fikes's Misstatements Influenced the Grand Jury's Decision To Indict**

Agent Fikes committed numerous errors in his testimony before the grand jury. Specifically, Agent Fikes's testimony contradicted the handwritten notes taken by his colleague, Agent DeMartino, ***during*** Tahir Ramin's interrogation.   Tahir Ramin told the interrogating agents that Tahir Ramin [identified as "S" for subject] and AZ ***"delivered all the barries [sic] on the call sheet."*** (*See* Exhibit A.) The DeMartino Notes state that other local contractors, though they failed to deliver the required number of barriers, were nevertheless paid as though they had: "Everyone (EHCO, NBC, NRO) *else* inflatted [sic] the numbers." (*See id.*)  In telling the agents that AZ had delivered the bunkers and barriers, but that everyone "else" had not, Ramin expressed his innocence of the claim that either he, John Ramin, or AZ had participated in the bunkers and barriers scheme.

Yet Agent Fikes did not convey Tahir Ramin's denial of wrongdoing to the grand jury. Instead, testifying from memory, he told the grand jury that Tahir Ramin had clearly incriminated himself during his post-arrest interrogation. Moreover, Agent Fikes told the grand jury that Tahir Ramin's statement was "substantially the same" as those made by corrupt military officials and co-defendants West and Moore – who entered guilty pleas on June 19, 2009 and July 1, 2009, respectively. (*See* Exhibit G.) But if West and Moore pointed at Defendants as willing participants in the bunkers and barriers inflation scheme, their stories simply were not "substantially the same" as Tahir Ramin's account.

Consistent with the interview notes, Agent Fikes testified that Tahir Ramin said that the "bunkers and barriers contractors" met on one occasion. Fikes failed to mention, however, that the reference to the contractors' meeting follows, **almost immediately**, the portion of the notes in which Tahir Ramin asserts that AZ "delivered all barries [sic] on the call sheet. Other companies did not deliver all barriers on the call sheet but got paid for full deliveries." (*See* Exhibit A.) Agent Fikes also failed to tell the grand jury how the "official" report of the interrogation recounted that Tahir Ramin was instructed to attend the meeting by known warlord "Goldie", who actively collaborated with Major West in the contractor shakedown scheme perpetrated at Bagram.[4] Importantly, Agent Fikes failed to inform the grand jury that the "official" report of the interrogation also stated that Tahir Ramin "**did not want to participate and both he and J. Ramin ignored later invitations.**" (*See* Exhibit C, at 4.)

---

[4] Evidence of collaboration between the corrupt military officials and local warlords has previously been ruled admissible to support Defendants' proffered duress defenses. (*See* Docket No. 509, at 7.)

### C. The Misleading And Inaccurate Testimony Also Was Used as the Joinder Vehicle Among the Defendants

In Counts 10 and 14, the government alleged overarching conspiracies among virtually all defendants (Counts 10 and 14) with reference to only one vaguely described meeting among the contractors. (Docket No. 201, at ¶¶ 72, 111.) This single alleged fact purports to link together all of the Afghani contractor defendants in the Superseding Indictment. In fact, because Agent Fikes's grand jury testimony was the sole evidentiary support of the Defendants' involvement in the bunkers and barriers scheme, there appears to be *no other untainted evidence* supporting the bunkers and barriers conspiracy charges against the Defendants contained in Counts 10 and 14 of the Superseding Indictment. By testifying that Tahir had essentially admitted to an overarching conspiracy with the other contractors, not only did the government obtain an indictment by improper means, it also created a joinder vehicle through inaccurate and misleading testimony.

### D. The Prosecution Failed To Inform The Grand Jury Of Important Evidence That Contradicted The Grand Jury Testimony

Although it is true that failure to present exculpatory evidence to a grand jury is not an independent basis upon which to dismiss an indictment, the failure to do so violates Department of Justice policy and compounds the prejudice suffered where misleading testimony is presented by a law enforcement agent. As distinguished from other lawyers, prosecutors are subject to unique constraints and responsibilities. *See, e.g., Berger v. United States,* 295 U.S. 78, 88 (1935). Almost 75 years ago, the Supreme Court, in *Berger,* highlighted the basic reason for checking and, where necessary, sanctioning prosecutorial misconduct.

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the

> two-fold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor – indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Id.* at 88. As Justice Douglas once cautioned, "[t]he function of the prosecutor under the Federal Constitution is not to tack as many skins of victims as possible to the wall. His function is to vindicate the right of people as expressed in the laws and give those accused of crime a fair trial." *Donnelly v. DeChristoforo,* 416 U.S. 637, 648-49 (1974) (Douglas, J., dissenting).

Here, by the time the Superseding Indictment was returned on June 18, 2009, the prosecutors were presumptively aware of Tahir Ramin's negations of guilt during his interrogation. They were presumptively aware that, more than three years before Tahir Ramin was arrested and charged, he had complained to the U.S. Army Criminal Investigations Division about West's activities in connection with the bunkers and barriers, and of Tahir's refusal to participate in any such scheme and his offer to assist authorities. They were presumptively aware of the interview report's account that Tahir Ramin "did not want to participate and both he and J. Ramin ignored later invitations," (*see* Exhibit C), as well as the report's ability to erode any justification for naming the Defendants in Counts 10 and 14. And the prosecutors were presumptively aware that the story Tahir Ramin told in his post-arrest interrogation – far from being "substantially the same" as that told by West and Moore – was in fact replete with exculpatory statements, including that the military officials' conduct was "like extortion." (*See* Exhibit B.) The prosecution also did not disclose to the grand jury that Tahir Ramin's denial was corroborated, at least indirectly, by independent evidence that West was running an extortion racket with other military personnel.

In the process, the prosecutors ran afoul of Department of Justice policy requiring that prosecutors disclose exculpatory evidence to the grand jury before seeking an indictment.

> In *United States v. Williams*, 112 S.Ct. 1735 (1992), the Supreme Court held that the Federal courts' supervisory powers over the grand jury did not include the power to make a rule allowing the dismissal of an otherwise valid indictment where the prosecutor failed to introduce substantial exculpatory evidence to a grand jury. ***It is the policy of the Department of Justice, however, that when a prosecutor conducting a grand jury inquiry is personally aware of substantial evidence that directly negates the guilt of a subject of the investigation, the prosecutor must present or otherwise disclose such evidence to the grand jury before seeking an indictment against such a person.*** While a failure to follow the Department's policy should not result in dismissal of an indictment, appellate courts may refer violations of the policy to the Office of Professional Responsibility for review.

United States Attorneys' Manual at § 9-11.233 (emphasis added); *accord* 1 ABA Standards for Criminal Justice, Standard 3-3.6(b), at 3-49 (3d ed. 1993) (requiring prosecutors to disclose to the grand jury "evidence which will tend to negate guilt").

Thus, while the prosecutors may not have been constitutionally obligated to present exculpatory evidence to the grand jury, they were unmistakably required by Department of Justice policy to do so. The prosecution compounded Agent Fikes's testimonial errors by failing to follow this policy and by failing to notify the grand jury of the inconsistencies between Agent Fikes's testimony and the contemporaneous interview notes. By falsely characterizing Tahir Ramin's denial of wrongdoing as a confession, and then failing to disclose evidence consistent with that denial, the government magnified the ways in which the grand jury was misled.

### E.    The Numerous Errors Prejudiced The Defendants

Taken in sum, the errors committed by Agent Fikes and the prosecution prejudiced the Defendants. The grand jury, which returned the Superseding Indictment a few hours after Agent Fikes testified, was clearly influenced by Agent Fikes's inaccurate and misleading testimony. Indeed, this fact in and of itself raises "grave doubt" that the grand jury's decision to indict was

free from the substantial influence of Agent Fikes's errors. Moreover, the government's failure to disclose evidence that negated Tahir Ramin's guilt – whether about Defendants' uninvolvement in the bunkers and barriers scheme or the evidence undermining the allegation that a single overarching conspiracy existed – exacerbated those errors. In violation of Department of Justice policy, the prosecutors failed to disclose, or to ask Agent Fikes about, any potentially exculpatory statements made by Tahir Ramin. These omissions also raise "grave doubt" that the Superseding Indictment was returned without being substantially influenced by such violations.

F.      **Judge Ashman's Rulings Regarding Grand Jury Testimony**

Magistrate Judge Ashman ruled that the Defendants, having demonstrated that Agent Fikes may have perjured himself during his June 18, 2009 grand jury testimony, were entitled to disclosure of any additional grand jury materials referencing the statement made by Tahir Ramin during his post-arrest interrogation. (Docket No. 464.) Magistrate Judge Ashman's opinion denied the supplemental motion in part, however, by restricting the disclosure to only those materials.

In an effort to ensure that they obtain all relevant materials in support of their motion to dismiss the indictment, the Ramins filed timely objections to Magistrate Judge Ashman's partial denial of their motion for grand jury disclosure on April 19, 2010. (Docket No. 475.) At oral argument before Magistrate Judge Ashman, Defense counsel had raised a concern that absent full disclosure of the grand jury materials, the prosecution would simply reference other, undisclosed information in response to Defendants' potential motion to dismiss. When the Magistrate Judge explicitly asked government counsel about this possibility, Government counsel declined to commit one way or the other. (*See* Feb. 16, 2010 Transcript, at 32-34, attached as Exhibit H.)

The Magistrate Judge replied that if the government could not make that representation, and if the Magistrate Judge found a basis to grant the motion, he would then be ***"obliged to grant the entire motion and open the whole grand jury testimony"*** to Defendants. *See id.* at 34 (emphasis added). The Magistrate Judge in fact found a basis to grant the motion, yet issued a narrow order for disclosure nonetheless. The government filed its response to the objections on May 11, 2010. (Docket No. 488.) In its response, the government stated that Agent Fikes's grand jury testimony on June 18, 2009 was the only transcript that referenced any statement made by Tahir Ramin. (*See id.*, at 3, n. 3.) To date, there has been no ruling on the Defendants' objections to the partial denial of their supplemental motion for grand jury disclosure.

## IV.  CONCLUSION

WHEREFORE, Defendants John Ramin, Tahir Ramin, and AZ Corporation respectfully request that the Court dismiss One, Three, Ten, Eleven, Fourteen and the Forfeiture Count of the Superseding Indictment against them. The Defendants further request that the Court grant access to the remaining grand jury testimony that has yet to be disclosed.

DATE: November 30, 2010

Respectfully submitted,

/s/ Kirby D. Behre

Kirby D. Behre
Paul, Hastings, Janofsky & Walker LLP
875 15th Street, NW
Washington, DC 2001
(202) 551-1700

*kirbybehre@paulhastings.com*

*Counsel to John Ramin and AZ Corp.*

Respectfully Submitted,

/s/ Thomas M. Levinson

Steven A. Miller
Bradley J. Bolerjack
Thomas M. Levinson
REED SMITH LLP
10 South Wacker Drive
Chicago, IL  60606
(312) 207-1000
*tlevinson@reedsmith.com*

*Counsel for Defendant Tahir Ramin*

# Exhibit A

Tom Fikes : ary DeMartino                                    1 of 7

Interview Notes of Tahir Ramin

25 Aug 08 - CBP/Chicago Airport / Interview Rm LL-438

- Tahir, Ramin                                    Start : 0940
- Polycharki Industrial Area ) Address in AF
  Camp Phoenix
    0797 - 41 - 1111 ( AF Number )    Telephone
- 5'11 / 240 - 250
  AFGHANISTAN (POB)              Date Issue : 15 Oct 2003
  Passport : 112847533    Type "P"   expires : 14 Oct 2013
  DOB : 10 Apr 1979
  - US Citizen (USA)

- Abdual Kadear
- 3 other people coworkers going through N.Y.
  -- Dubia to N.Y. tomorrow
- Talked to CID for investigation about 2-3 weeks ago
  for corruption : Bribery
  -- Another person in (S) company
  -- Bribery - swing business for transportation - AIT
  -- (S) company put complaint into about investisation
  -- (S) gave complaint to Maj is contrading
  -- Service member S Sgt Clifton  POC for Transportation
    --- Clifton gives them more business to AIT
    --- (S) Company was ranking #1 then Clifton came
      into business.
    --- AIT paying for Clifton's telephone in AF and money.

- In the past, everytime a unit leaves, CID will come
  in and ask questions.
  -- Happen a couple of times in the past, but not recently.
  -- Busyest time was 2002.

-- CID would ask alot of question
- AZ has been up since fall of Taliban -- about 2 months after
- (S) came in a year after
- Brother (John) was there establishing a phone company AZ
  -- Company did not work out
- Then John went to military for contracts
- Whole family in AF - big family (50-100 people)
  -- Father in parliament
- AZ (S) and John manages
- AZ intended to be a telephone company
- (S) Oct 2003 was contracting for chairs, desks, memory sticks computers wood, fire wood
- (S) arrived started taking over opertions.
- AZ works for Army Corps for AA compounds, basic security transportation, water plant
- Line Haul
- Water Plant - last year
- Army Corps - last year
- Even in 2002 CID talked about bribery investigations.
- John said CID always comes in and asks question when Army leaves.
- Capt. Brad Antes - CID asked (S) questions about
  -- Antes was at base ops.
- (S) worked with Antes for 2-3 months. Then Antes left.
  -- CID come to (S) and asked question about bribery (2003
- AZ good rehtionship with CID
- Lt. Moore got caught with money - Base Ops (Moore)
  -- CID came and asked everyone questions.
  -- They kept Moore continued to base
  -- Resign his commission.

Tahir Ramin - Vi-e President
A2 Corp.
tel: 93-20-220-3428    fax: 9320-220-3292
POBox: 5628   Kabul - Afghanistan
Kabul Mob: 93-700-41-11-11 / 93-797-41-11-11
Dubai Mob: 971-50-940-1215

3 of 7
Business
Card

- Ⓢ interacted with Moore
- 2 other NBC, NRO interacted with Moore along
  with A2 and a hand full of other companies
- Ⓢ worked with Moore : Maj. West
- West replaced Antes
- Moore worked with for West.
- West and Moore approached Ⓢ to participate in
  a bunker : barriers sceme : A2 would not have to actually
  ✗ delivery the bunkers : barriers but get paid.
- NRO, NBC, DHCO (or something like that)
- All companies knew the sceme. - Well known they take money
- AIT and ATT own by same guy - Ajama
- Finch: told CED abut Finch
- Ⓢ frusteratsel about the contracting and service members
  and the bribery.
- Ⓢ just want a "fair play ground" - At this point Ⓢ
  says it is not a "fair play ground."
- Well known thing in Baghram "these guys took money"
  -- Bunkers : barries sceme.
- Had Bunkers : barries "IQ" for 5 years.
- West delt with All of Baghram. From sandbags to ... everything.
  -- They wanted a share/cut out of it. - everything.
- West working with Ⓢ at about 3 months in Baghram.
- -- Ⓢ brother John was running everything.
- Finch kicked A2 out of line haul contract
  -- Finch found another way to make money
- Finch was going to bring new companies in.
  -- " brought in news companies because A2 could not
  provide the service.
- Ⓢ asked them to maintain records.

4 of 7

- Finch brought in 2 new companies and took money from the
  -- The new companies could not provide "refers"
- like the "Wild, Wild, West" Wanted a fair playing ground and was forced into scemes by service members.
- Some contractors good contractors, did not play and were kicked off the base at Baghram.
- Didery order with IPIQ Contract, West he would not delivery the orders if he didn't get paid.
- John delt with West. Maybe my brothers gave West money.
- That is how it worked.
- Moore & West were a team. (They were at Base Ops)
- "West was the face" He was in charge.
- Bunkers & barriers ⑤ never did wire transfers
- Wire transfers was new in AF - was not up and running.
  -- Cash was how it was handled with West & Moore.
- West would not move your barrieds (bunkers!) if he was not paid. No money, no delivery.
- West used email and phone to call AZ
  -- You want your B:B moved, West needs paid. - John paid.
- Lt Moore did not move the B:B until he got paid upfront.
- ⑤ knew about about the money seized from Moore.
  -- Abdual Tatuse (in custody) said the money Moore was caught with was his. It came from NRO / NBC.
- Abdual told ⑤ on the plan ride over here that it was his money.
- West had a big month, flash money around, would talk to anyone.
- The deliery was set by the contracting office. Barriers went from weekly - monthly, now to yearly.

- Call sheet says the need 500 barriers. Then AZ would work to delivery the barriers.
- ~~Bate~~ Bribe what was ever they wanted - West/Moore did not have a set price.
- (5) delivered all barries on the call sheet. Other companies did not deliver all barriers on the call sheet but got paid for full delivery
- Everyone (EHCO, NBC, NRO) else inflated the numbers.
  -- He knows by "talking to the guys". This is not a big deal in AF
  -- EHCO is the war load call meeting. "Goldie". he & Kalonie (brothers) were the war lords. They were the main. (5) paid everyday to war lord to so into the gate. Phone or phone card. One time they did not stop and war lords shot up his car. They no longer have to pay. They are no longer at Bashram gate   [Gold Teeth]
  --- (5) went to one ~~meeting~~ meeting with Goldie, NRO, NBC EHCO presidents Quadoos was present
  --- Talked about how to move bunkers & barriers, pricing, all stay in the same together.
  --- John said (5) do not go any other time.
- West always went out - off post.
  -- Would call contractors and say I am in Kubal, come hang out with me.
  -- They did not invite him (West) to Kubal, come ~~out~~ and drink.
  -- Wanted to get/stop West from coming.
  -- Dangerous, father/brother told (5) not to go.
  -- West alway had ~~money~~ - had money from everyone

6 of 7

- Prosetution is all over Kubal  Chinese women.
- (S) did not want to go to presetution house.
  -- (S) and John would not go.
- It was a mood thing $5 to $20,000.00. given to
- West/Moore, for B/B
- -- (S) Guess it was about $15K-$20K for a large orders
- West would not ask for small things. People in the
- military does not do small things.
  -- Pay you out of "FunMoney". Chairs, desk, thumb drive.
- Line Haul - Maj. Rogers was contracting office.
- Finch come into the picture, Line Haul was being renewed
  -- AIT and ATT- Brought new companies in.
  -- Kicked AZ out, not doing a good enough job.
  -- Finch Kicked out AZ / was not sure why?
  -- Refers and freezer / AZ was doing.
  -- Bubba John was a war lord in Bagram.
  -- Patcha starting doing business wit AIT/ AIT
  -- Signed one contract and a sub-contractor
  -- Adjmal (newpher of Bubba John) paid $50,000 (to Finch)
     to get rid of AZ.
  -- Came to AZ to get the freezers.
  --- John did not give them the freezers. They don't freezers
      they will kill John : (S).
  -- Told Rogers about the threats to AZ.
  -- Finch came to AZ and wanted them back.
  --- Finch Kicked out 2 or 3 companies.
  --- AZ has access to each others emails (John : (S))
  --- Finch came to AZ and wanted $50K for them to
     get back in the contract for freezers.
  --- John told (S) to send Finch $50K.

2 of 7

- (S) was not there when Finch and John for the money.
- (S) and John have tention in there relationship
- John's policy 6 months, you get 2 weeks vacation.
- Fired (S) numerous times.
- Wants (S) to stay in AF. (S) wants to come back to the USA
- AZ provides a lot of jobs in the area. Jobs are hard to come by
- Shima (sister) did the transactions - wire transfers.
  -- " lives in house in PA
  -- " takes care of Mom, Phone bills. (Pays bills)
  -- " does small things, what ever they need done.
  -- " does not know why the money is being sent.
- Finch still emails AZ.
  -- Says the Cancer Foundation needs money. (A few weeks ago.)
  -- (S) and John hates Finch to this day. ("John hated his guts!")
- (S) does not know of any other transactions to Finch.
- (S) does not remember Anna Sacheves
- (S) brother also handled transportation.
- 1205 break
- 1255 Start
- 1324 Tom : Gary Departed.

# Exhibit B

1330    8/25/08    1/4

Tahir Ramin
  - Talked Tom F. about Transport
  Contract in DAF
Transport Company Names
            AIT & ATT
  Has documents To Show Fraud.


~ Mark Pletcher DOJ 1400 ~    8/25/08


Firach approached AZ wanted $50,000
  To get Contract back renewed
AIT/ATT came into picture

· Asked Cal Vise to track performance
· Bought Refrig Trux - AZ
· AIT Not performing
· Firach approached John R. for $50,000
· Tahir an show him e-mail where Sent
  $ - Father Otis Dixon
· last 2 wks Firach wants $ for a "Charity
  Foundation"

2/4

- Finch 50% partner w/ AET A.T.T
  + have been Sending him $ up to recently

- Finch DD250's Fraud Ghost trucks
  Probably ATT ATT

- AET /ATT wanted AZ trucks Refig - Theats
  - said No
  - Finch reapproached John

- Anne Chavez - N/A
  _____

TOPS Constr
  Bunker / Barr    N/A
  West + Moore
  Joe B.B - each co makes Some each
  if you paid Finch - got Paid for delivery

J. Ramin would probably get employee to pay
  West Moore
  _____

34

Antes / Molhalzo
    doesn't know - had just Arrived
    when They leaving - heard Mol.
    Shaking them down
Tahir TO Afgh Oct 2003

— After West - Honest Guy in Ofc.

  Antes - Greedy
    Ran Away w/$20,000 of Qudos $
    loan - Divorce
  Qudos On Plane Said Moore $ came
  from Qudos

  Went to Warlord Mtg on Company
  processes - Talked about West Moore
  - Paying them was an expense

  - Navarro Sti 4-5 months ago goes to
  Afgh - begs for job
    does paperwork for Az - No Contracts

  Az wire to Navarro ?

44

- Mo came back to Afgh - Acts like
  gangster. was. Soldier.
    - Majul Faraha - Every year tries
    to get job. - before Antes period
    Is like Extortion

- Tom Rivtne appointed to AE By Col. Wise
    to start water plant

Uncle - Afgh Ministry of Agr.
Father - Parliament
- Uncle - AWCC pres phone Company
  Zahir in USA w/ wife & kids in PA

# Exhibit C



**INSPECTOR GENERAL**
**DEPARTMENT OF DEFENSE**
**DEFENSE CRIMINAL INVESTIGATIVE SERVICE**
**INDIANAPOLIS RESIDENT AGENCY**
**6666 E. 75TH STREET, STE 501**
**INDIANAPOLIS, IN 46250-2860**

(Investigations)

200600215Y-07-NOV-2005-40SL-A2                                        August 25, 2008

WEST, Christopher P., (et al)

<u>INTERVIEW OF TAHIR RAMIN:</u> On August 25, 2008, Tahir Ramin (T. Ramin) was
interviewed at Chicago O'Hare International Airport, Chicago, IL, by SA Thomas Fikes, U.S.
Army Criminal Investigation Division (CID) and SA Gary DeMartino, Defense Criminal
Investigative Service (DCIS). The following identification data was obtained from T. Ramin:

| | |
|---|---|
| Name: | Tahir Ramin |
| Business Title: | Vice President, A.Z. Corporation |
| Business Location: | A.Z. Corporation |
| | Policharki International Area |
| | Camp Phoenix, Afghanistan |
| Business Mailing Address: | A.Z. Corporation |
| | P.O. Box 5628 |
| | Kabul, Afghanistan |
| U.S. Address: | 4773 Kathi Drive |
| | Bethlehem, PA 18017 |
| Date of Birth: | April 10, 1979 |
| Passport Number: | 112847533 (Type "P" - USA) |
| Date Issued: | October 15, 2003 |
| Date Expired: | October 14, 2013 |
| Height: | 5'11" |
| Weight: | 240lbs |
| Citizenship: | USA |
| Email Address: | tahirramin@hotmail.com |
| Business Telephone Number: | +93-20-220-3428 |
| Business Fax Number: | +93-20-220-3292 |
| Kabul Cellular Telephone Number: | +93-700-41-11-11 |
| | +93-797-41-11-11 |
| Dubai Cellular Telephone Number: | +971-50-940-1215 |

Prior to commencing the interview, SA Fikes reviewed T. Ramin's rights pursuant to
*Miranda* with T. Ramin; T. Ramin read aloud each of the rights as set forth in the Warning and
Waiver of Rights that is attached hereto as enclosure (1) and placed his initials next to each of

| CLASSIFICATION: | WARNING |
|---|---|
| **OFFICIAL USE ONLY** | This document is the property of the Department of Defense Inspector General and is on loan to your agency. Contents may not be disclosed to any party under investigation nor may this document be distributed outside the receiving agency without the specific prior authorization of the Assistant Inspector General for Investigations. |

200600215Y-07-NOV-2005-40SL-A2                                    August 25, 2008

the enumerated rights. T. Ramin acknowledged his understanding of his rights, waived them, and signed the form, again stating that he wished to make a voluntary statement to the interviewing agents. During the interview T. Ramin provided the following information:

The A.Z. Corporation (AZ), an Afghanistan National Based Corporation, was established by his brother John Ramin (J. Ramin) two months after the fall of the Taliban in 2002. Initially J. Ramin established AZ as a telephone company however; the telephone focus of the company did not prosper. J. Ramin disengaged from pursuing the telephone aspect of the company, and started to focus on U.S. military contracts for Bagram Airfield (BAF), Afghanistan. Initially, J. Ramin was successful in winning small contacts for AZ for items such as: chairs, desks, computer memory sticks, wood for building structures, and fire wood. T. Ramin arrived one year after the company was formed and took over AZ operations. By then, AZ had grown and was awarded major contracts with BAF. T. Ramin took over AZ management of U.S. military contracts such as: basic security, transportation, and the water plant. AZ currently has about 1000 employees. AZ is now run by both T. Ramin and J. Ramin however, since J. Ramin is the older of the two and the founder of AZ, J. Ramin has the majority of the vote for the company. Also, T. Ramin has been distancing himself from AZ and trying to leave the company. T. Ramin wants to permanently stay in the U.S. and does not wish to live and work in Afghanistan. T. Ramin does not get along with J. Ramin. In the past, J. Ramin has fired T. Ramin on several occasions but, has always re-hired T. Ramin. Due to family pressure, T. Ramin is currently still working for the company but he is not sure how long this will last.

T. Ramin said that AZ had a good relationship with CID investigators. On several occasions, AZ has cooperated with CID agents by answering questions concerning investigations. In the past, every time a military unit departed BAF, CID agents would visit AZ and ask questions attempting to identify crime and/or corruption implicating U.S. military contracting personnel. Although, investigators have shown up in the past, this type of inquiry has not happened recently. On one occasion, sometime in 2003, CID agents asked T. Ramin questions concerning a bribery investigation in connection with Captain Brad Antes (Antes). Antes worked at base operations on BAF. T. Ramin worked with Antes for approximately two months before Antes departed. Major Christopher West (West) replaced Antes.

T. Ramin knew that Lieutenant Robert Moore (Moore), who worked for West at BAF base operations, was caught with several thousand dollars. T. Ramin interacted with Moore and West due to their contracting positions. Moore interacted with representatives from the following companies: AZ, Northern Reconstruction Organization (NRO), Naweed Bakhshi Company (NBC) and "a hand full of other companies." Abdul Qudoos Bakhshi, the owner of NBC, told T. Ramin on the flight to the United States that the money Moore was caught with came from him.

West and Moore approached T. Ramin about a corruption scheme concerning the "bunkers and barriers" contract. The scheme was that AZ would pay Moore and West an agreed upon amount of money. In turn, AZ would not have to deliver a set amount of "bunkers or

| CLASSIFICATION: | WARNING |
|---|---|
| OFFICIAL USE ONLY | This document is the property of the Department of Defense Inspector General and is on loan to your agency. Contents may not be disclosed to any party under investigation nor may this document be distributed outside the receiving agency without the specific prior authorization of the Assistant Inspector General for Investigations. |

barriers" but Moore and West would make it look like AZ fulfilled their end of the order. All of the BAF contractors knew about the scheme as it was common knowledge. Several other companies were awarded the bunkers and barriers contract. Some companies would deliver a smaller amount of barriers which were required on the "call sheet" but claim they fulfilled the entire order. "Everyone (EHCO, NBC, NRO) inflated the numbers." West and Moore would not assign and/or take delivery for a specific order until they were paid in full for the agreed upon amount. The bunkers and barriers deliveries were set by the contracting officer representatives (West and Moore). The deliveries went from weekly, to monthly, and eventually annually.

Since wire transfers were new in Afghanistan, West and Moore were paid their bribery money in cash. J. Ramin was the person from AZ that was responsible for paying West and Moore the pay off money in cash. For example: A call sheet sent out by the contracting officer said they need 500 barriers. AZ would deliver 500 barriers as requested but first would have to pay West and Moore whatever they asked prior to getting paid by the military. Their bribe price varied and was not set. T. Ramin felt the pricing was a "mood thing" with West. West asked for bribes ranging from $5.00 to $20,000.00 dollars. However, for large orders, the pay off ranged from $15,000 - $20,000. Usually, West himself would not ask for small amounts.

If you did not pay off West and Moore, you would not get the contract or they would not take delivery of your order. You had to "pay to play." West and Moore worked as a team and, "West was the face." It was a well known fact that "these guys took money." West dealt with all of the BAF contracts, "from sandbags to ...everything." West wanted a kick back for everything.

West would often call several of the contractors on the telephone when he would go into Kabul, Afghanistan, for leisure activities. West would ask the contractors to come out and join him at local establishments. West always had money because of the bribes he received from the contractors. T. Ramin was told he could not meet with West by J. Ramin and his father because the city of Kabul was too dangerous. T. Ramin did not welcome the invitation and tried to discouraged West from calling.

At one point, Charles Finch (Finch) was the contracting officer representative and Major Rogers was the contracting officer. At the time, the line haul contract was up for renewal. Adjumal (NFI), the son of Bubba John (NFI) who was a known warlord, paid Finch $50,000 to get rid of AZ and make sure they were "kicked out" of the line haul contract. Also for the money, Finch brought two new companies, AIT (NFI) and ATT (NFI), into the line haul contract. Finch had to explain to his chain of command why he recommended AIT and ATT receive the contract so, he fabricated a story claiming AZ could not provide the services outlined in the contract. This was an inaccurate because AZ could provide the services as outlined on the contract. AZ has the necessary freezers to meet the line haul contract obligations and AIT and ATT did not. At one point, AIT and ATT came to J. Ramin and tried to sub-contract AZ for the line haul contract. J. Ramin refused to sub-contract with the companies which resulted in both

CLASSIFICATION:

OFFICIAL USE ONLY

WARNING

This document is the property of the Department of Defense Inspector General and is on loan to your agency. Contents may not be disclosed to any party under investigation nor may this document be distributed outside the receiving agency without the specific prior authorization of the Assistant Inspector General for Investigations.

4

200600215Y-07-NOV-2005-40SL-A2

August 25, 2008

T. Ramin and J. Ramin receiving death threats. Because AIT and ATT could not provide the services, Finch came to AZ and wanted them back in the contract. Finch told J. Ramin that if they wanted back in the line haul contract, it would cost them $50,000.00. T. Ramin was not present when this conversation took place. J. Ramin instructed T. Ramin to send Finch the $50,000.00 so they could get back into the line haul contract. For this reason, the Ramin brothers, especially J. Ramin, have a deep hatred for Finch. A few weeks ago Finch emailed AZ asking for money. Finch masked the request by saying, "The cancer foundation needs money."

T. Ramin insisted J. Ramin made the business decisions, to include whether or not to pay bribes. Yet, when confronted about his role, he conceded his involvement in making bribe payments. T. Ramin utilized his sister, Shaima Ramin (S. Ramin), who resides in the U.S., to make bank transactions to Finch and others. He directed her to wire or send money from their bank accounts to individuals or accounts used by the service members. However, T. Ramin told S. Ramin the payments were to suppliers and she knew nothing about the bribery.

T. Ramin just wanted a "fair playing ground" however; it has not been fair since he has been there. Every contracting officer assigned to BAF seems to want a kick back / bribe for contracts and orders. He claimed it was like the "wild, wild west." A few honest companies would not pay the contacting officer a kick back. Those companies no longer have contracts.

A senior warlord named "Goldie" directed T. Ramin to attend a meeting with the other local line-haul contractors. The purpose of the meeting was to fix line-haul prices amongst the contractors in regards to military contract bids. Both NBC and NRO were also represented. However, T. Ramin did not want to participate and both he and J. Ramin ignored later invitations.

Paying bribes for contracts is an accepted practice in Afghanistan. Earlier on after the fall of the Taliban, Goldie, his brother and his followers were in charge of the area around BAF. Everyday, Goldie and his people would position themselves just outside the BAF main gate. They would charge a fee for anyone wishing to enter BAF. Sometimes they would ask for a cellular telephone or a telephone card. T. Ramin always gave them what they wanted. On one occasion, T. Ramin refused their demands and his vehicle was shot several times.

T. Ramin spoke with Army CID BAF investigators about 2-3 weeks ago complaining of additional bribery and corruption with AIT. T. Ramin claimed to have evidence that a contracting officer named Sergeant Clifton (Clifton) was giving more business to AIT than other contractors. In return, AIT gave Clifton money and paid for his international cellular telephone. T. Ramin also gave the information to a Major (NFI) in the BAF contracting office. T. Ramin complained that before Clifton arrived on BAF, AZ was ranked number one. The ranking is established by the contracting officer. Due to the high turnover rate of the contracting officers at BAF, a numerical contractor ranking system was established so the incumbent contracting officer would be able to examine the performance of each contractor. AZ is no longer ranked number one because Clifton is showing partiality and taking bribes from AIT.

CLASSIFICATION:

OFFICIAL USE ONLY

WARNING
This document is the property of the Department of Defense Inspector General and is on loan to your agency. Contents may not be disclosed to any party under investigation nor may this document be distributed outside the receiving agency without the specific prior authorization of the Assistant Inspector General for Investigations.

200600215Y-07-NOV-2005-40SL-A2

5

August 25, 2008

Attachments(s)
      (1) Rights waiver – Tahir Ramin
      (2) Tahir Ramin's AZ Corporation Business Card

Prepared by SA Gary J. DeMartino
DIST: 40ML (SA Berry) / USACID – Detroit, MI (SA Fikes)

APPR: GJD/MRB

| CLASSIFICATION: | WARNING |
|---|---|
| OFFICIAL USE ONLY | This document is the property of the Department of Defense Inspector General and is on loan to your agency. Contents may not be disclosed to any party under investigation nor may this document be distributed outside the receiving agency without the specific prior authorization of the Assistant Inspector General for Investigations. |

FD-395 (Rev. 11-8-82)

# ADVICE OF RIGHTS

Place _O'Hare IAP, Chicago, IL_
Date _25 AUG 2008_
Time _0937_

### YOUR RIGHTS

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

Signed _____

Witness: _Thomas Fikes_

Witness: _Gary J. DeMartino_

Time: _0944_

**Tahir Razaia**
Vice President





AZ Corporation

Tel. : +93 20 220 3429, Fax : +9320 220 3292
P.O. Box : 5628, Kabul – Afghanistan
E-mail : tahirrazaia@hotmail.com
Kabul Mob : + 93 700 41 11 11
+ 93 797 41 11 11
Dubai Mob : + 971 50 940 1215

# Exhibit D



**INSPECTOR GENERAL**
**DEPARTMENT OF DEFENSE**
**DEFENSE CRIMINAL INVESTIGATIVE SERVICE**
MILWAUKEE POST OF DUTY
517 EAST WISCONSIN AVE, ROOM 530
MILWAUKEE, WI 53202

(Investigations)

200600215Y-07-NOV-2005-40SL-A2                                       August 29, 2008
WEST, Christopher P., (et al)

**INTERVIEW OF TAHIR RAMIN:** On August 25, 2008, at approximately 2:00 PM,
Department of Justice, Antitrust Division, Trial Attorney Mark Pletcher (Pletcher), and the
reporting agent conducted an interview of Tahir Ramin (T. Ramin), 4773 Kathi Drive,
Bethlehem, Pennsylvania, DOB 4/10/1978, SSN 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, at the Chicago, IL O'Hare
Airport, U.S. Customs and Border Protection, immigration, detention area. T. Ramin and several
other government related contractors from Afghanistan, had arrived at O'Hare Airport on the day
of the interview. T. Ramin is a subject of an investigation for bribery, and conspiracy to commit
bribery, involving U.S. Military personnel working in the Base Operations S4 office, Bagram Air
Field (BAF), Kabul, Afghanistan. Other U.S. Military personnel under investigation also
include, U.S. Army, Major Christopher West (West), First Lieutenant Robert Moore (Moore),
Sergeant First Class Charles Olanda Finch (Finch), First Lieutenant John Mihalczo (Mihalczo)
and Sergeant Wes Navarro (Navarro). Prior to the interview, T. Ramin was apprised as to the
identity of the reporting agent, the nature of our interview and thereafter T. Ramin reiterated his
wish to speak with the reporting agent after having been reappraised of his rights prior to our
interview:

T. Ramin is part owner of AZ Corporation (AZ Corp), a defense contractor located in
Kabul, Afghanistan. Following the loss of a transportation contract held by AZ Corp, T. Ramin
was approached by Finch, who requested T. Ramin pay him $50,000.00 dollars in order to help
AZ Corp again obtain the previously lost transportation contract which AZ Corp had with the
U.S. government. T. Ramin explained that AZ Corp had recently lost the contract to companies
AIT and ATT. According to T. Ramin, ATT was not able to fulfill its transportation contract
with the U.S government, so Finch approached John Ramin (J. Ramin), the primary owner of AZ
Corp, asking for $50,000.00 in bribe money, in order to bring AZ Corp back into the contract
regarding the transportation of refrigerated goods to BAF. T. Ramin stated that AZ Corp had
previously purchased refrigeration trucks to fulfill the transportation contract prior to its loss to
AIT and ATT. T. Ramin explained that he can provide e-mail communications showing that AZ
Corp sent money to Finch's father, Otis Dixon located in the U.S., from Afghanistan, in return
for the contract award.

After AIT and ATT were awarded the refrigeration truck transport contract, they could
not fulfill their obligations because they did not have enough refrigeration trucks to do the job.
According to T. Ramin, AIT and ATT needed J. Ramin's refrigeration trucks, and told J. Ramin

CLASSIFICATION:

OFFICIAL USE ONLY

**WARNING**
This document is the property of the Department of Defense
Inspector General and is on loan to your agency.  Contents
may not be disclosed to any party under investigation nor
may this document be distributed outside the receiving
agency without the specific prior authorization of the
Assistant Inspector General for Investigations.

200600215Y-07-NOV-2005-40SL-A2                                    August 29, 2008

that they would kill him if he did not allow them to use AZ Corp's trucks. J. Ramin refused AIT and ATT's demands. Follwing AIT and ATT's threats on J. Ramin's life Finch approached J. Ramin and asked that AZ Corp fulfill the contract in return for the $50,000.00 bribe to help AZ Corp regain the transportation contract.

T. Ramin was asked if Finch was processing fraudulent DD250 forms, a Department of Defense form used by contractors to be paid for deliveries, for delivery trucks which never existed (ghost trucks), to have contractors receive more money from the U.S. Government? T. Ramin replied that if it occurred, it was probably done for the sake of AIT or ATT. T. Ramin further explained that Finch would designate a certain number of concrete bunkers and barriers to be produced by each company participating in the manufacture of the concrete bunkers and barriers, and once the barriers were delivered, and the contractor paid Finch a bribe, Finch would then pay the contractor for the delivery. T. Ramin then explained that Finch is a 50% partner in ATT Company, located near BAF, and up until recently, he has been receiving money from ATT, and within the last two weeks, Finch has sent e-mails to AZ Corp, requesting further money for a "charitable foundation".

T. Ramin explained that U.S. Army, Major Brad Antes (Antes), former S4, and assistant S-4, Mihalczo were working in the contracting office at BAF when T. Ramin first began working for AZ Corp in October, 2003, and "heard" that Mihalczo was "shaking down" AZ Corp. T. Ramin then explained that Antes, who had returned to the U.S. after his deployment to Afghanistan, returned to Afghanistan to work for AZ Corp, but left Afghanistan after working only a short time for AZ Corp. T. Ramin further explained that Antes left Afghanistan with $20,000.00 he had borrowed from another Afghani contractor by the name of Qudos, who loaned the money to Antes due to Antes having financial trouble and needing the money while going through a divorce.

T. Ramin then explained that he had gone to a meeting conducted by a local warlord in Afghanistan. At the meeting, the local Afghanistan companies contracting with the U.S. Government discussed procedures for making money from the U.S. contracts. Also at the meeting there were discussions about two U.S. Army soldiers named West and Moore. The contractors present at the meeting concluded that paying West and Moore was a regular necessary expense when contracting with the U.S. Government. T. Ramin stated that J. Ramin would probably instruct an employee of AZ Corp to pay bribes to West or Moore, keeping J. Ramin away from the illegal activity. T. Ramin then explained that once West returned to the U.S., at the end of his deployment to Afghanistan, an honest officer replaced him in the contracting office.

According to T. Ramin, while on the flight to the U.S. from Afghanistan - the day of this interview - Qudos, another of the Afghani contractors and owner of NBC working with BAF, explained to T. Ramin that the money Moore had been caught shipping home to the U.S., was from Qudos.

T. Ramin stated that several individuals who had previously been in the U.S. Army and deployed at BAF in the contracting office, had returned to Afghanistan to work for AZ Corp. T. Ramin explained that Navarro, who arrived in Afghanistan approximately four to five months

---

CLASSIFICATION:

OFFICIAL USE ONLY

WARNING
This document is the property of the Department of Defense Inspector General and is on loan to your agency. Contents may not be disclosed to any party under investigation nor may this document be distributed outside the receiving agency without the specific prior authorization of the Assistant Inspector General for Investigations.

200600215Y-07-NOV-2005-40SL-A2                                          August 29, 2008

prior to this interview, begged J. Ramin for a job. J. Ramin, gave Navarro a position at AZ Corp and Navarro is now doing paperwork for AZ Corp. T. Ramin stated that Navarro is not performing work which is contract related. T. Ramin also explained that Mihalczo returned to Afghanistan looking for work with AZ Corp, but is playing no role in contracts with BAF. Mojul Faraha, who led the contracting office on BAF, prior to Antes, attempts to get a job with AZ Corp every year, but is never offered a position by J. Ramin.

T. Ramin further explained how J. Ramin had approached a Colonel Wise ( Wise) located at BAF, asking Wise to incorporate a performance tracking system to ensure companies would only lose contracts due to poor performance, and not by other means. T. Ramin also explained that Wise appointed Lieutenant Colonel Tom Divine to AZ Corp, in order to get the AZ Corp water bottling plant operational, which would eventually supply BAF.

T. Ramin was asked if he knows the name Anna Chavez, to which T. Ramin responded that he did not recognize the name. T Ramin was asked if he knew of any wire transfers going to Navarro, to which T. Ramin responded that he did not know of any wire transfers going to Navarro. T. Ramin was then asked if he knows of a company named Tops Construction, to which T. Ramin responded that he does not know the company name.

T. Ramin then explained that his uncle is the Afghan Minister of Agriculture, his father is in the Afghan Parliament, another uncle is President of the AWCC Communications Company in Afghanistan, and his brother Zahir, is located in the U.S. with his wife in Pennsylvania.

At the conclusion of the interview, T. Ramin was placed under arrest and transported to the Metropolitan Correctional Center, Chicago, IL.

Prepared by SA John C. Todd, Milwaukee POD                    APPR: JCT/MDB
DISTR: 40CH ONLY

CLASSIFICATION:

OFFICIAL USE ONLY

WARNING
This document is the property of the Department of Defense Inspector General and is on loan to your agency. Contents may not be disclosed to any party under investigation nor may this document be distributed outside the receiving agency without the specific prior authorization of the Assistant Inspector General for Investigations.

# Exhibit E



**INSPECTOR GENERAL**
**DEPARTMENT OF DEFENSE**
**DEFENSE CRIMINAL INVESTIGATIVE SERVICE**
MILWAUKEE POST OF DUTY
517 EAST WISCONSIN AVE, ROOM 530
MILWAUKEE, WI 53202

(Investigations)

200600215Y-07-NOV-2005-40SL-A2                              September 19, 2008

WEST, Christopher P. (et al.)

<u>**SPECIAL INTEREST CASE**</u>

<u>**INTERVIEW OF TAHIR RAMIN**</u>: On August 25, 2008, the Reporting Agent (RA) and Department of Justice, Antitrust Division, Trial Attorney Mark Pletcher (Pletcher) conducted an interview of Tahir Ramin (T. Ramin), 4773 Kathi Drive, Bethlehem, PA, DOB 4/10/1978, SSN 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, at the Chicago O'Hare International Airport, Chicago, IL, U.S. Customs and Border Protection, immigration detention area. T. Ramin and several other government contractors from Afghanistan had arrived at Chicago, O'Hare International Airport on the day of the interview. T. Ramin is a subject of an investigation for bribery, and conspiracy to commit bribery, involving U.S. Military personnel working in the Base Operations S-4 office, Bagram Air Field (BAF), Kabul, Afghanistan. Other U.S. Military personnel under investigation also include, U.S. Army, Major Christopher West (West), First Lieutenant Robert Moore (Moore), Sergeant First Class Charles Olanda Finch (Finch), First Lieutenant John Mihalczo (Mihalczo) and Sergeant Wes Navarro (Navarro). Prior to the interview, T. Ramin was apprised as to the identity of the RA, the nature of our interview and thereafter T. Ramin reiterated his wish to speak with RA after having been reappraised of his rights prior to our interview. During the interview, T. Ramin stated the following:

T. Ramin is part owner of AZ Corporation (AZ Corp), a defense contractor located in Kabul, Afghanistan. Following the loss of a transportation contract held by AZ Corp, T. Ramin was approached by Finch, who requested T. Ramin pay him $50,000.00 in order to help AZ Corp again obtain the previously lost transportation contract which AZ Corp had with the U.S. government. AZ Corp had recently lost the contract to companies AIT and ATT. ATT was not able to fulfill its transportation contract with the U.S government, so Finch approached John Ramin (J. Ramin), the principal owner of AZ Corp, asking for $50,000.00 in bribe money, in order to bring AZ Corp back into the contract for transportation of refrigerated goods to BAF. AZ Corp had previously purchased refrigeration trucks to fulfill the transportation contract prior to its loss to AIT and ATT. T. Ramin can provide e-mail communications showing that AZ Corp sent money to Finch's father, Otis Dixon, located in the U.S., from Afghanistan, in return for the contract award.

After AIT and ATT were awarded the refrigeration truck transport contract, they could not fulfill their obligations because they did not have enough refrigeration trucks to do the job. AIT and ATT needed J. Ramin's refrigeration trucks, and told J. Ramin that they would kill him if he did not allow them to use AZ Corp's trucks. J. Ramin refused AIT and ATT's demands. Subsequently, Finch, knowing AIT and ATT could not fulfill their obligations under the contract,

---

CLASSIFICATION:

OFFICIAL USE ONLY

**WARNING**
This document is the property of the Department of Defense Inspector General and is on loan to your agency. Contents may not be disclosed to any party under investigation nor may this document be distributed outside the receiving agency without the specific prior authorization of the Assistant Inspector General for Investigations.

200600215Y-07-NOV-2005-40SL-A2                                    September 19, 2008

                                                                          2

approached J. Ramin and asked that AZ Corp fulfill the contract in return for the $50,000.00 bribe to help AZ Corp regain the transportation contract.

T. Ramin did not know with certainty if Finch was processing fraudulent DD250 forms [a Department of Defense form used by contractors to be paid for deliveries] for non-existent delivery trucks ("ghost trucks"), in order to have contractors receive more money from the U.S. Government, but if it occurred, it was probably done for the benefit of AIT or ATT. Finch would designate a certain number of concrete bunkers and barriers to be produced by each company participating in the manufacture of the concrete bunkers and barriers, and once the barriers were delivered, and the contractor paid Finch a bribe, Finch would then pay the contractor for the delivery. Finch is a 50% partner in ATT Company, located near BAF, and up until recently, he has been receiving money from ATT, and within the last two weeks, Finch has sent e-mails to AZ Corp, requesting further money for a "charitable foundation".

U.S. Army Major Brad Antes (Antes), former S-4, and assistant S-4, John Mihalczo (Mihalczo) were working in the contracting office at BAF when T. Ramin first began working for AZ Corp in October, 2003. T. Ramin "heard" that Mihalczo was "shaking down" AZ Corp. Antes, who had returned to the U.S. after his deployment to Afghanistan, returned to Afghanistan to work for AZ Corp, but left Afghanistan again after working only a short time for AZ Corp. Antes left Afghanistan with $20,000.00 he had borrowed from another Afghani contractor by the name of Qudoos [Abdul Qudoos Bakhshi], the owner of BAF contractor NBC, who loaned the money to Antes due to Antes having financial trouble and needing the money while going through a divorce. T. Ramin was also aware that Qudoos paid bribes to West and Moore: while on the flight to the U.S. from Afghanistan [the day of this interview] Qudoos admitted to T. Ramin that the money Moore had been caught shipping home to the U.S. was from Qudoos.

T. Ramin had gone to a meeting conducted by a local warlord in Afghanistan. At the meeting, the local Afghani companies contracting with the U.S. Government discussed procedures for making money from the U.S. contracts. Also at the meeting there were discussions about two U.S. Army soldiers named West and Moore. The contractors present at the meeting concluded that paying West and Moore was a regular necessary expense when contracting with the U.S. Government. T. Ramin stated that J. Ramin would probably instruct an employee of AZ Corp to pay bribes to West or Moore, keeping J. Ramin away from directly partaking in the illegal activity. Once West returned to the U.S., at the end of his deployment to Afghanistan, an honest officer replaced him in the contracting office and the bribery scheme was discontinued.

Several individuals who had previously been in the U.S. Army and deployed at BAF in the contracting office had returned to Afghanistan to work for AZ Corp. Sergeant Wesley Navarro (Navarro), who returned to Afghanistan approximately four to five months prior to this interview, begged J. Ramin for a job. J. Ramin gave Navarro a position at AZ Corp and Navarro is now doing paperwork for the company. Navarro is not performing work related to government contracts. Mihalczo had also returned to Afghanistan looking for work with AZ Corp, but plays no role in contracts with BAF. Umoja Furaha, who led the contracting office on BAF, prior to Antes, attempts to get a job with AZ Corp every year, but has never been offered a position by J. Ramin.

---

CLASSIFICATION:

OFFICIAL USE ONLY

WARNING
This document is the property of the Department of Defense Inspector General and is on loan to your agency.  Contents may not be disclosed to any party under investigation nor may this document be distributed outside the receiving agency without the specific prior authorization of the Assistant Inspector General for Investigations.

J. Ramin approached a Colonel Wise (Wise) at BAF, asking Wise to incorporate a performance tracking system to ensure companies would only lose contracts due to poor performance, and not by other means. Wise appointed Lieutenant Colonel Tom Divine to AZ Corp, in order to get the AZ Corp water bottling plant operational, which would eventually supply BAF.

T. Ramin did not recognize the name Anna Chavez [a soldier formerly assigned at BAF] or Tops Construction [another BAF contractor]. T Ramin was also unaware of any wire transfers going to Navarro from AZ Corp. T. Ramin was then asked if he knows of a company named, to which T. Ramin responded that he does not know the company name.

T. Ramin's uncle is the Afghan Minister of Agriculture, his father is in the Afghan Parliament, another uncle is President of the AWCC Communications Company in Afghanistan, and his brother Zahir, is located in the U.S. with his wife in Pennsylvania.

At the conclusion of the interview, T. Ramin was placed under arrest and transported to the Metropolitan Correctional Center, Chicago, IL.

Prepared by: SA John Todd, Milwaukee POD
DISTR: USACIDC - Detroit (Fikes)/40IN/DOJ (Pletcher)          APPR: JCT/MRB

CLASSIFICATION:

OFFICIAL USE ONLY

WARNING
This document is the property of the Department of Defense Inspector General and is on loan to your agency. Contents may not be disclosed to any party under investigation nor may this document be distributed outside the receiving agency without the specific prior authorization of the Assistant Inspector General for Investigations.

# Exhibit F

```
 1
 2                  IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
 3                           EASTERN DIVISION

 4
    UNITED STATES OF AMERICA,          )      No. 08 CR 669-4
 5                                     )
                      Plaintiff,       )
 6                                     )
              v.                       )      Chicago, Illinois
 7                                     )      October 9, 2009
    TAHIR RAMIN,                       )      1:45 p.m.
 8                                     )
                      Defendant.       )      Suppression Hearing
 9
10                     TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE DAVID H. COAR
11
    APPEARANCES:
12
    For the Government:      United States Department of Justice
13                           National Criminal Enforcement Section
                             Antitrust Division
14                           BY:  MR. MARK W. PLETCHER
                                  MS. EMILY W. ALLEN
15                           450 5th Street, N.W.
                             Suite 11300
16                           Washington, D.C.  20530

17
    For Defendant T. Ramin:  REED SMITH LLP
18                           10 South Wacker Drive
                             40th Floor
19                           Chicago, Illinois  60602
                             BY:  MR. STEVEN A. MILLER
20                                MR. BRADLEY J. BOLERJACK
                                  MR. THOMAS M. LEVINSON
21
    For Defendant A. Ramin:  PAUL HASTINGS JANOFSKY & WALKER, LLP
22                           875 15th Street, N.W.
                             Washington, D.C.  20005
23                           BY:  MR. KIRBY D. BEHRE

24                  TRACEY DANA McCULLOUGH, CSR, RPR
                           Official Court Reporter
25                         219 South Dearborn Street
                                 Room 1420
```

1    A.  No, I do not.

2               MR. MILLER:  Judge, I'd like to move into evidence

3    those two exhibits.

4    BY MR. MILLER:

5    Q.  You recognize both of those as reports that you wrote,

6    correct?

7    A.  Yes, I do.

8               THE COURT:  Any objections?

9               MR. MILLER:  I'm sorry.  Was there an objection?

10              MS. ALLEN:  Your Honor, I'm not sure if the witness

11   recalled authoring this report.

12              THE COURT:  He's testified that he authored both of

13   them.  If there is an objection, it's admitted.  Go ahead.

14      (Whereupon, Defendant's Exhibits 5 and 6 were received in

15       evidence.)

16   BY MR. MILLER:

17   Q.  Now, before you wrote either the September 19th version or

18   the August 29th version, you sat in a room with Tahir Ramin and

19   as he was telling you things you wrote down the notes in

20   longhand, correct?

21   A.  Yes.

22   Q.  You have a handwritten version of notes, correct?

23   A.  Yes.

24   Q.  Let me show you what's marked as Defendant's Exhibit No. 4

25   and ask if you recognize those as your handwritten notes?

1    A.   Yes, they are.

2    Q.   Okay.  And did you write down what you considered to be

3    important?

4    A.   As you're writing notes, you write down what's being said.

5    If you think it's important, fine.  If you want to continue

6    writing notes on those ideas, fine.  At the time these are the

7    ideas I thought would be relevant.

8    Q.   Relevant and important, correct?

9    A.   I thought they would be important, yes.

10   Q.   Okay.  Nowhere in your handwritten notes did you ever write

11   that Mr. Ramin was mirandized by Mr. Pletcher, did you?

12   A.   No.  He said nothing about that.

13   Q.   Nowhere -- nowhere in your handwritten report did you

14   indicate that Mr. Ramin had been mirandized, correct?

15   A.   No, I did not.

16   Q.   Now, nowhere in your handwritten report do you indicate

17   that Mr. Ramin was told that he had been indicted, correct?

18   A.   Correct.

19   Q.   You did not tell him he had been indicted?

20   A.   No, I did not.

21   Q.   Okay.  Nowhere in your handwritten report do you tell Mr.

22   Ramin that he was in custody, isn't that correct?

23   A.   That's correct.

24   Q.   You did not tell him he was in custody, did you?

25   A.   No, I did not.

1   Q.  He was not in handcuffs, correct?

2   A.  No, he was not.

3   Q.  Okay.  Now, you asked him about what had been going on at

4   Bagram Air Force base, didn't you?

5   A.  Yes, I did.

6   Q.  And Mr. Ramin told you that one military officer there

7   acted like a gangster, didn't he?

8   A.  Yes.

9   Q.  And he told you that with respect to yet a second military

10  officer it was like extortion, didn't he?

11  A.  Yes.

12  Q.  So those are very strong and powerful words, aren't they?

13  A.  Yes.

14  Q.  And you're hearing an accusation from someone who's just

15  been indicted on bribery charges, that there are military --

16  commissioned military officers at Bagram Air Force Base one is

17  a gangster and it's like extortion, correct?

18          MS. ALLEN:  Objection, mischaracterizing the facts.

19          THE COURT:  I sustain.  Don't characterize it.  His

20  testimony is his testimony.

21  BY MR. MILLER:

22  Q.  Okay.  You did not put any of that language in your --

23  either version of your official reports, did you?

24  A.  No.

25  Q.  Now, Officer, did you not think it was important

1   information when Mr. Ramin told you this?

2   A.   No, I did not think it was important information.

3   Q.   Well, how long have you been -- had you been a federal

4   agent for at that time?

5   A.   Since February of 2002.

6   Q.   And are you unaware of the extortion statutes?

7   A.   I am aware of the extortion statutes.

8   Q.   Okay.  You had someone who had just been indicted days

9   earlier for paying bribes, and he's telling you he's being

10  extorted, correct?

11  A.   What the defendant said was like extortion with no

12  follow-on information.  I could not give a concise report or

13  accurate report by assuming to know what he meant by this.

14  Q.   Well, you didn't have to make an assumption.  Your job was

15  to accurately report what the witness said, what Mr. Ramin

16  said, correct?  And leave it up to a judge or jury down the

17  road to understand what that might mean, correct?

18            THE COURT:  Where did that obligation come from?

19            MR. MILLER:  You're right.  It was a half a question

20  too long.  I withdraw the question.

21  BY MR. MILLER:

22  Q.   Your obligation was to accurately report what you thought

23  was relevant, correct?

24  A.   Absolutely.

25  Q.   All right.  And it was relevant enough when you wrote your

1  handwritten report, correct, to write it down?

2  A.  Yes.

3  Q.  You made a deliberate decision not to put it in the

4  official version of the report, correct?

5  A.  Correct.

6  Q.  All right.  Did you have an understanding as to under the

7  Federal Rules of Procedure what discovery defense lawyers

8  receive -- are obligated to receive from the government within

9  a short period of time after someone is charged with a crime?

10  A.  Oh, I understand --

11          MS. ALLEN:  Objection.

12          THE COURT:  Sustain the objection.

13  BY MR. MILLER:

14  Q.  Were you present in the room that Tahir was being -- Tahir

15  Ramin was being interviewed in all morning long as well as in

16  the afternoon?

17  A.  I was not present in that room with him in the morning.

18  Q.  Where were you?

19  A.  I was in a separate interview room interviewing another

20  subject.

21  Q.  Now, did you review any materials before testifying today?

22  A.  Yes, I did review my notes and my official report.

23  Q.  Did you review grand jury testimony given by Agent Fikes?

24  A.  No, I did not.

25  Q.  Did you have a copy or did you read the arrest warrant that

# Exhibit G

```
IN RE:   GRAND JURY      )        GRAND JURY NO.
         INVESTIGATION    )           06 GJ 304
```

BEFORE THE FEDERAL GRAND JURY

(Special February 2008-2 Grand Jury)

June 18, 2009

1:30 o'clock p.m.

PRESENT:

UNITED STATES DEPARTMENT OF JUSTICE
ANTITRUST DIVISION, by
MR. MARK PLETCHER
MS. EMILY W. ALLEN
National Criminal Enforcement Section
Washington, D.C.

(The Grand Jury, having reconvened

at 1:30 o'clock p.m. on the 18th

day of June 2009, pursuant to

adjournment, met in closed session

and the following proceedings were

had herein.)

THOMAS FIKES,

having entered the Grand Jury Room, was sworn by the

Foreperson as follows:

THE FOREPERSON:  You do

solemnly swear that in the

testimony you are about to give

before this Grand Jury you will

speak the truth, the whole truth,

and nothing but the truth, so help

you God?

THE WITNESS:  I do.

THE FOREPERSON:  Thank you.

Please be seated.

MS. ALLEN:  Good afternoon,

Agent Fikes.

Before we get started is their

a quorum present?

THE FOREPERSON: Yes.

EXAMINATION

BY MS. ALLEN:

Q   If you would introduce yourself again to the

Grand Jurors, since it's been a little while.

A   My name is Tom Fikes.  I'm a Special Agent

with the U.S. Army's Criminal Investigation Division.

THOMAS FIKES

people who spoke with you?

  A   He was.  When we arrested him, we interviewed

him.   Prior to his arrest, he agreed to talk to us;

and that was the last time we spoke to him.

  Q   And just as a reminder, Tahir Ramin is the

owner of which company?

  A   He is the owner of AZ Corporation, operations

officer of AZ Corporation.

  Q   And did he talk specifically about a scheme

to inflate the number of bunkers and barriers

delivered to Bagram Airfield?

  A   He did.  He talked about the arrangements

that he had with Christopher West and

Lieutenant Moore, he and his brother John Ramin,

wherein they were paying both Moore and West in order

to inflate the bunkers.

  Q   And did you have an opportunity to talk to

defendant Christopher West?

  A   We did.

  Q   Has he agreed to cooperate with the

investigation?

  A   He has.  We've interviewed him a number of

times now, and he's corroborated most of the

allegations and is cooperating with the investigation

THOMAS FIKES

and intending to enter a plea tomorrow.

Q    Has he agreed to plead guilty to the charges, the bribery charges in the original indictment as well as the bunkers and barriers inflation?

A    That's correct.

Q    And did you have a chance to talk with Sergeant Patrick Boyd?

A    We did.  We interviewed him a couple of times as well.  He also corroborated the allegations at large and provided additional facts that we didn't -- did not know.

Q    Just to clarify, was Patrick Boyd one of the military officers who received money as part of this inflation scheme?

A    Patrick Boyd -- His involvement was at the contracting office, and so there's -- he was involved in the direct decision-making.

Q    Okay.  Someone named Captain John Mihalczo, have you spoken with him?

A    Yes.

Q    And who he is?

A    Captain Mihalczo was the predecessor of Christopher West's assistant, Lieutenant Moore.  So he's an Illinois National Guard soldier, again, who

THOMAS FIKES

preceded those two; and so he was involved in the

same sorts of activities, had the same responsibility

as West and Moore did.

BY MR. PLETCHER:

    Q    Just a point of clarification.  Captain Mihalczo

is from which unit?

    A    He is with the 214th Area Support Group, I

believe  it was.

    Q    He's not Illinois National Guard?  He's --

    A    Correct.  He was with Pennsylvania National

Guard.

BY MS. ALLEN:

    Q    And relevant to the inflation of bunkers and

barriers, did he provide information about that from

when he was deployed at Bagram?

    A    He did, yes.  He discussed his involvement in

various schemes to include an arrangement to inflate

bunkers and barriers.

    Q    And has he agreed to cooperate with the

investigation?

    A    Yes.  He's cooperating with the

investigation, and he's also scheduled to enter a

plea to the charges.

    Q    Okay.  Have you met an individual named

THOMAS FIKES

Charles Patton?

A    I have.

Q    Who is Charles Patton?

A    Charles Patton was a friend of
Christopher West.  He was a fellow National Guard
soldier of Illinois.

He was not deployed with West or Moore, so he
remained behind.  And he became important because he
was the friend that helped West launder the money
back from Afghanistan to the U.S.

Q    And has he agreed to cooperate?

A    He's -- We've interviewed him a number of
times, and he's agreed to cooperate and will be
entering a plea relevant to the conduct he's
participated in.

Q    Have you met an individual named Angela West?

A    Yes, I have.

Q    Who is she?

A    Angela West is Christopher West's spouse, and
she also participated in helping to launder the money
after he'd sent it back home and hide it from the
investigators.

Q    Has she cooperated with the investigation?

A    Yes.  We've interviewed her a number of times

THOMAS FIKES

as well, and we're negotiating with her.

Q   Who is Bashir Ahmed?

A   Bashir Ahmed was the interpreter and vice-president of Noor Alam's company, NRO, Northern Construction Organization.

Q   Okay.  Have you had a chance to talk with him?

A   I have not.

Q   Have other investigators in the case?

A   But he has been interviewed by investigators in the case.

Q   Have you -- have you learned information from those other investigators about the substance of his interviews?

A   Yes.  They've related to me his information from his interactions with Noor Alam and Christopher West and Robert Moore, as far as their agreements again to participate in the bunkers and barriers scheme.

Q   And how does he have information about that scheme?

A   Well, he operated as the interpreter for Mr. Alam, so he was at those meetings.  He was part of the conversations.

THOMAS FIKES

Q    Okay.  And did he have useful knowledge about
this scheme?  Was he aware of it and --

A    Yes, he was.  He was at the first meeting
where Christopher West and Noor Alam discussed the
proposition of inflating or getting involved in the
bunkers and barriers scheme and inflating the
profits.

They discussed the money, how much money
Noor Alam would give to Christopher West.  And then
ultimately after agreeing to it and returning with
that money, he was there when Noor Alam handed the
cash over to Christopher West.

Q    Finally, an individual named Gerald Hallowell.
Can you explain who he is?

A    Gerald Hallowell was another friend of
Christopher West, also a National Guard soldier, and
he was deployed in Afghanistan.

He became relevant early on in the
arrangement with AZ Corporation and John and
Tahir Ramin because he was at the first meeting where
John Ramin and Christopher West discussed this scheme
to inflate bunkers and barriers.

Q    And has he agreed to cooperate with the
investigation?

THOMAS FIKES

A    Yes.

Q    Before we get into the details of the illegal
activity, I'd like for you to walk us through how the
contracting process for bunkers and barriers works --
or worked -- at Bagram Airfield.

So there are -- Is this what is known as an
indefinite delivery-indefinite quantity contract
vehicle?

A    Correct.  That's a common contracting vehicle
where there is a cap, an overall cap on the service
or product, whatever is to be provided, and basically
there's an agreed-upon price and terms for the
contract with the contractor.

At which point going forward in the future,
the government can request a certain amount or any
given amount as needed by operations at that time,
and then the contractor will provided under the
pre-agreed terms.

Q    Okay.  Is it -- just for shorthand, I'll call
it an IDIQ contract.

And so in this particular case, were there
multiple contractors all awarded IDIQs for the same
service or product?

A    Correct.  Bunkers and barriers were like

12

THOMAS FIKES

other services where the military seeks to have a
diversified supply chain, so they had awarded four
separate contracts to four separate contractors to
provide bunkers and barriers.

Q    And was the government obligated to order any
particular amount of bunkers and barriers pursuant to
the contract?

A    There may have been a minimum, but there was
-- the ceiling was capped by the amount awarded, you
know, set aside for that particular contractor.

Q    For their requirement?

Just as a reminder, can you explain very
briefly what bunkers are and what barriers are so
everyone is on the same page?

A    Much like the concrete dividers you see
amongst the much construction you have going on
around here in Chicago that divide different lanes,
they would come in various heights, according to the
application.

So there could be short ones, like, four foot
concrete dividers, and they put them together to make
a wall.  Or even taller ones, six to eight feet tall
to put a larger perimeter around something.

Now, the bunker itself would be basically a

THOMAS FIKES

similar structure with a covering over the top, so it would have two sides and a ceiling.

Q    Is this IDIQ an annual agreement with the contractors?

A    Correct.

Q    And who were the four contractors that were -- that the DOD was procuring bunkers and barriers from in early 2004?

A    The four contractors were AZ Corporation, NRO, NBC and a company called EHCO.

Q    When the contracts were renewed, was that sometime around October 2004?

A    Correct.

Q    And were they then up for resolicitation opened to a new group of contractors?

A    Correct.

Q    And who was the contracting officer responsible for awarding the renewal contracts?

A    At that time it was Patrick Boyd.

Q    For the renewal in 2004, who were the companies that won the next contract?

A    AZ Corporation, NBC and NRO all remained, and then a new company known as Top's Construction was awarded the fourth.

THOMAS FIKES

Q    What did your investigation reveal about
Top's Construction?  What -- who owns that company?

A    Top's Construction, as we've come to learn,
was basically a front company for the Ramins, another
branch of AZ.

Understanding that they could only get
however much within the one contract that they were
awarded, the one-fourth of the four that were
awarded, both John and Tahir Ramin and the S4
operations officers realized that they could make
more money if they could get another contract.  The
only way to do that was to have a no-show company.

Q    Okay.  Was this arrangement something that we
talked about before back in August of 2008?

A    Yeah.  We outlined this in August as part of
the underlying activity.

Q    Okay.  And so the Ramin brothers had offered
Major West and Lieutenant Moore compensation to get
this done?

A    Yeah.  They basically purchased their way in
with Top's, you know, Top's way in into the contract.

Q    And how much did they pay for it?

A    They agreed to $30,000.

Q    And who was the contracting officer who

THOMAS FIKES

awarded that contract?

A    That was Patrick Boyd.

Q    What happened to EHCO, the company that had
had this contract the year before and now was out.
How come Moore and West were willing to let EHCO out
of the deal?

A    Well, they had a very solid relationship with
the Ramins.  They felt they could trust them within
the situation within the schemes they had developed
and felt they were very reliable.  They were not so
confident with the owner of EHCO.

So, consequently they were willing to let
that company go and to bring the Ramins back into a
bigger portion.

Naturally that didn't make EHCO very happy,
and the owner of that company was -- voiced his
concerns.  I mean, the activities going on were
fairly well known within the contractor community.
They were all Afghani Nationals and most of them knew
each other.

So he voiced, you know, voiced his complaints
to West and Moore, and ultimately they felt obliged
to help him out on a new contract in order to keep
him quiet.

THOMAS FIKES

Q    Is this information that you learned from
Lieutenant Moore?

A    Correct.

Q    And have you seen support for that in the
contract documents themselves?

A    Yes.  We received those contracting actions
as they occurred.

Q    After the contracts were awarded -- again,
let's assume the process is working the way that it's
intended to work -- the -- is it correct that the
contracting office would issue an order for product?

A    That's our understanding.

Q    And then what do the companies do in response
to that order?

A    The company gets an order to supply a number
of bunkers or barriers.  They would pull them out of
their storage lot if they have them or manufacture
them, obviously it would take a little bit of time
for the concrete to set up.

So then they would bring those barriers or
bunkers onto the base, and then they would be stored
at a holding field on Bagram Airfield.

Q    Okay.  And who would they coordinate with at
Bagram that they were making this delivery?

THOMAS FIKES

A    Well, the base operations office, which would
be Major West and Lieutenant Moore were the ones who
would confirm those deliveries.  So they would
coordinate with them to get onto the base and to get
the bunkers and barriers into the holding facility.

And then ultimately it was the responsibility
of Major West or Lieutenant Moore or another
representative to sign off on those deliveries to
verify that they actually took place.

Q    And the sheets that the contractors bring
with them, are those invoices?

A    Correct.

Q    And then what are the forms called that West
and Moore, or whoever from the S4 shop, is verifying
delivery?  What are those forms?

A    So the contractor provided an invoice of its
own -- of its own design, and then the government has
a military form called a DD-250, which basically
reiterates the numbers that are on the invoice; and
then the government official would sign off on that
verifying the numbers.

Q    Okay.  And then where do they go with that
signed DD-250?

A    So those documents go back to the contracting

THOMAS FIKES

office -- officer to verify that the order took place
and then ultimately go to the finance office so that
the money can be disbursed.

Q    How was money disbursed?

A    At that time, it was being disbursed through
cash.  The banking system was a bit rough, so it was
handed out in U.S. dollars.

Q    At Bagram?

A    At Bagram.

Q    How did Moore and West and the contractors
they're working with profit from this process,
personally profit from this process?

A    Well, obviously, as I said earlier, there was
a predetermined price for each of the bunkers or
barriers.  That included the cost of the materials to
make them as well as the profit for the company.  So
that overall price was for each individual barrier.

So what they did is they inflated the
numbers; for example, they would, instead of
delivering 20 -- on an order of 25, they would
deliver only 20, so that there were five more that
did not exist; but they would get signed off on as
having delivered 25 barriers.

So those five non-existent barriers would be

THOMAS FIKES

paid out ultimately off of the invoice, and that
would be a hundred percent profit, so that the
contractor -- the agreement was the contractor would
split that profit fifty-fifty with the operations of
West and Moore.

Q   So West and Moore were aware that the
invoices were inflated?

A   Correct.

Q   And they would have to be aware, right,
because they would -- they would see the bunkers and
barriers coming onto the base?

A   Right, right.

Q   And it's their job, ideally, to verify
accurately the numbers that are coming in?

A   That's correct.

Q   Those five -- we'll call them the ghost
deliveries, the five bunkers that didn't actually
show up on the base -- is the contractor paying
anything out to get those or are the payments coming
in for those five just pure profit for the
contractor?

A   Just pure profit, no cost to them, obviously.

Q   When you spoke with Captain Mihalczo about
this -- Well, let me back up.

THOMAS FIKES

The information that you've just been talking
about, about the arrangement with the contractors,
who told you about those facts?

A    Moore did as well as Major West.  Tahir Ramin
discussed it in his interview.

Q    And those three individuals told
substantially the same sort of version of --

A    The stories were substantially the same.

Q    Did you learn similar facts from Bashir, from
NRO?

A    Correct.

Q    And when you spoke with John Mihalczo, what
did he tell you about what was operating at Bagram
the year before while he was there?

A    Well, he was involved in a number of schemes
as well, and one of those was the exact same sort of
scheme as far as the bunkers and barriers.  He had
made an agreement with one of the contractors to
inflate the delivery orders, split the profits.  I
believe he estimated he got about $40,000 for that.

Q    And given that he got about $40,000, what was
his estimate for how much the contractor may have
gotten in that arrangement?

A    They were splitting it fifty-fifty, they

THOMAS FIKES

would also get 40,000.

Q    I'd like to walk through the details by
company of this scheme.  Now that you've had a chance
to talk to more witnesses than you were able to last
August, you have a little more information on the
details?

A    Yes.

Q    How did the -- How did this scheme begin when
-- with West and Moore when they first arrived at
Bagram?  How did they -- how did they get involved in
doing this in the first place?

A    West learned that there was a relationship,
there was an opportunity -- that was a word that was
often used -- opportunity to make money through his
predecessor, Captain Brad Antes.  And ultimately,
West and John Ramin arranged to have a meeting.

And what they did is they got together in a
car and drove around the airfield and talked.  This
was the meeting that Major Gerald Hallowell was at
and was a witness to.  And during this meeting,
John Ramin discussed how he had -- how he wanted to
make more money.  He had done this previously with
the other operations officers, and he wanted to work
with West, with the bunkers and barriers, inflating

THOMAS FIKES

it and increasing his profits.

Q    What did West say in response?

A    He initially didn't commit, but he eventually did.

Q    Once he agreed to do this, what did they start actually doing?  Did AZ begin bringing in inflated invoices?

A    Yeah.  That's our understanding is they seemed to act on the arrangement.

Q    And did -- did they deliver payment as they promised?

A    Yes, they did.

Q    Okay.  Did you find any of the DD-250s in your investigation that Major West had signed for AZ?

A    We did.

Q    And how many -- Over the course of these four contracts with all the different companies, how many DD-250s would you estimate there are?  I mean, very vague, ballpark.

A    That's a good question.  Dozens, dozens.

Q    It's a big number?

A    Yeah.

Q    In the interest of saving time and significant boredom, I'll just use one as a

23

THOMAS FIKES

representative example of a DD-250, and I'll mark
this as an exhibit --

                    MR. PLETCHER:  18.

BY MS. ALLEN:

     Q    Exhibit 18.  Take a look at that form.

          Is that a familiar-looking document?

     A    Yeah.  This is a DD Form 250.

     Q    And what is it a -- What product are they
verifying?

     A    It's the Material Inspection and Receiving
Report, is the title of the document or what the
document is called; and in this case, it's verifying
delivery of bunkers and barriers.

     Q    Okay.  And the company that supposedly
delivered all these bunkers and barriers?

     A    This was for AZ Corporation, attention
John Ramin.

     Q    Okay.  What's the date that this was signed?

     A    It was signed 3 August '04.

     Q    And who signed it?

     A    Signed by Christopher West.

     Q    What's that marking right underneath his
signature?

     A    That was -- We observed under a number of

24

THOMAS FIKES

these DD-250s signed by Major West what appears to be
a little smiley face.

               A GRAND JUROR:  Pardon me?

               THE WITNESS:  A smiley face.

          That little circular --

BY MS. ALLEN:

    Q   In the indictment on page, the count --

        You've got a copy of the indictment in front
of you, Agent Fikes?

    A   (Indicating.)

    Q   All right.  Page 25 of the indictment,
there's a chart there.  DD-250 certifications for
contracts, that would be 2004 bunkers and barriers
contract awards to AZ.

        You following me on that?

    A   I am.

    Q   And those calculations, all those numbers on
the chart, are they derived from the DD-250s that
you've collected as part of your investigation?

    A   Correct.

    Q   And the certifying official on these -- most
of them say West.  That's like on this form where
West signed at the bottom?

    A   Correct.

THOMAS FIKES

Q    And Person A here, that's Lieutenant
Robert Moore?

A    That's correct.

Q    These total amounts on each of the listed
DD-250s, those are the amounts that were verified to
be delivered; is that right?

A    That is correct.

Q    Is that also the amounts that were actually
delivered to Bagram?

A    No.  That would include the actual delivered
and inflated, the nonexisting bunkers and barriers.

Q    And then the payment records here, they have
a slightly different date.  And these payment
records, have you seen DOD documentation to verify
that all those payments were in fact made?

A    Correct.

BY MR. PLETCHER:

Q    Agent Fikes, in looking at that chart, is the
certification "Certifying Official" column consistent
with your understanding that Major West had a
relationship with AZ?

A    Yes, generally speaking, what we've seen.

BY MS. ALLEN:

Q    And now on page --

THOMAS FIKES

A GRAND JUROR:  If I could
just bring to your attention, on
page 25, the very first line.
Their DD-250s certification date is
7-30, your payment date is 7-3.  So
he got paid 27 days before the
certification?  Must be a typo.

MS. ALLEN:  You're right.  It
must be a typo.  Thank you.

MR. PLETCHER:  I believe the
correct date for the order is 6-30.

BY MS. ALLEN:

Q    And, Agent Fikes, on page 26 there's another
chart.  This is the list of certifications and
payments on AZ's 2005 contract.  That would have been
awarded in October of 2004; is that right?

A    Correct.

Q    And again, are these records, are these -- is
this a summary of DD-250 records verifying deliveries
that you've seen --

A    That is correct.

Q    -- collected as part of this investigation?

A    Correct.

Q    And the payment records are also things

THOMAS FIKES

you've collected in --

A    Yes.

Q    -- in this investigation?

I apologize.  I've been pointing you to the wrong page.  Can you back up to page 23?

All right.  These are -- Sorry.  I was just looking at the charts for the wrong company.  These essentially are the same -- I'm going to ask you the same list of questions.

Have you seen the payment records for these?

A    Yep, seen them all.

Q    Okay.  All right.  Good.

And then on page 24, there's a third chart here, and these are the payment and DD-250 summaries for the Top's Construction contract; is that right?

A    Right.

BY MR. PLETCHER:

Q    My same question to you is the "Certifying Official" column consistent with your understanding of which military official had the relationship with Top's Construction and John and Tahir Ramin?

A    That is correct.  West generally had a relationship with those individuals.

Q    Thanks.

THOMAS FIKES

BY MS. ALLEN:

Q   When you spoke with Tahir Ramin and he
explained to you, you said that he knew about this
inflation scheme, that he had been part of it, did he
tell you that he had delivered payment to West and
Moore?

A   He talked in somewhat general terms.  He a --
the payments were made by he and his brother.

Q   His brother, John Ramin?

A   Yeah.  His brother directed them, I think was
more or less the context of how he put it.  So he
hesitated to say explicitly he did it.

Q   Did he tell you that he was aware that other
contractors were doing the same thing?

A   Yes.  Like I said earlier, the contractor
community, they generally knew each other and what
each was doing and they discussed it.

     In this case, he was the first person to tell
us that the bunkers and barriers contractors actually
had gotten together and discussed the situation as
far as, you know, the fact that they were making
arrangements with the operations office and they
wanted to come to an agreement as to what a good
bunkers and barriers price would be.  And that was

THOMAS FIKES

later corroborated by Bashir.

Q     And remind us.  Bashir is the interpreter
for --

A     For NRO.

Q     Okay.  So was Bashir at that meeting,
according to what he told you?

A     Yeah, that's my recollection.

Q     What did his boss, again Noor Alam, the owner
of NRO, report about what happened at that meeting,
as far as you remember?

A     Just that they agreed that, you know, this
was how business was going to be done, that they were
going to be, you know, paying the operations office
to be involved in these contracts; and that they, you
know, came to an agreement on what a reasonable price
for the bunkers and barriers was going to be in light
of that having to make those payouts.

Q     Now, according to what Bashir has said -- and
again, I know you weren't there -- but based on
information from other investigators in the case, is
this how they learned, how NRO as a company, learned
about West and Moore's involvement in inflating
invoices?

A     To my recollection is that they learned

30

THOMAS FIKES

explicitly when West approached them.  Again, they
may have heard -- the first agreement was with the
Ramins.  They may have heard about them prior to
their meeting with West.

Q    Okay.  And what did -- what did West say when
he approached them?

A    Basically that, you know, they needed to pay
if they wanted to be in with the bunkers and barriers
contracts.

Q    What was their response?

A    Somewhat lukewarm.  He had asked for a
number, $50,000 I think is how Bashir related it, and
they did not commit right away; but they did come
back and did pay for it.  That's when he paid, I
think it was $27,000 that they ultimately ended up
paying.  They had agreed on 30, but they shorted him
a couple of grand.

Q    Now, according to your recollection of what
Bashir had said, was this in relation to the renewal
contract in October of 2004?

A    Yeah.  I believe that was when this was
getting worked.

Q    So this is basically a payment so that NRO
could be -- could remain a player in bunkers and

THOMAS FIKES

barriers?

A    Correct.

Q    Did they also talk about inflating invoices?

A    Yes.  And that was part of the deal as well.
First they had to buy to stay in on the contracts;
and then once they had done that, they would be able
to make additional profits by participating in the
inflation scheme.

Q    Okay.  Once they brought inflated invoices
and received payment for them, did Bashir deliver the
payment to West and Moore?

A    He did.  I believe approximately four times,
around four times he said he had made payments.

Q    And again, have you seen DD-250s signed by
West and by Moore showing that NRO had delivered
bunkers and barriers?

A    Yes.

Q    And show you on page, this time actually on
page 25 of the indictment.

And this chart represents a summary of all
those payments that you've seen?

A    Yes, it does.

Q    And certifications of delivery?

A    (Indicating.)

THOMAS FIKES

BY MR. PLETCHER:

Q    Is the certifying official in this column
also consistent with your understanding of
Major West's relationship with NRO?

A    Correct.  West was the one who approached
NRO, and his name is on the documents.

BY MS. ALLEN:

Q    All right.  I think you testified last time
that West had built a relationship with NRO and NB --
NRO and AZ and that he had suggested to Moore that
Moore should build a relationship with NBC?

A    Correct.

Q    Did Moore actually do that?

A    Yes.  He related how he had followed West's
lead as just how West had made the first arrangement
with Mr. Ramin in a car, he arranged a meeting with
Bakhshi and his interpreter in a car ride.  And at
that time, he asked them to join the scheme.

Q    What did Mr. Bakhshi say about that?

A    He related that -- that it was fine, that
Moore had nothing to worry about because he had done
it with previous personnel, he had been involved in
similar schemes with previous personnel; and that
there was a quote to the effect of, "We will be like

THOMAS FIKES

brothers."

    Q   Did he mention that he'd done -- when he said
he'd done the same thing before, did he mention who
it was, just with the previous command?

    A   That was -- yeah, I believe.

    Q   That was the implication?  Okay.

    Again, I'll go quickly through these.

    On page 26 and 27, it's a longer two-page
chart.

    Are these reflective of DD-250 certifications
that you've seen for NBC?

    A   It would.

    Q   And the payment records as well?

    A   Correct.

BY MR. PLETCHER:

    Q   The certifying official, Person A, certifying
most of these things consistent with your
understanding of Lieutenant Moore's relationship with
NBC?

    A   That does seem to be the case, yes.

    Q   Nice to have a roll.

BY MS. ALLEN:

    Q   And again, on page 28, are these the charts
for the second year, the 2005 contract, for NBC; and

THOMAS FIKES

again, are these an accurate summary of the DD-250s
that you've collected?

A   Yes.

Q   And did Moore tell you whether or not he was
paid by NBC?

A   He did.  He was, a number of times.  And per
the arrangement with Chris West, he split the moneys
with him.

Q   Okay.  When West and Moore divided the
proceeds, did they have any type of arrangement or
ritual for doing so?

A   Yeah.  They -- As Moore related, they would
get together, kind of a formal -- formal-type meeting
where they would get together in their quarters, and
they would kind of count the money out to make sure
everyone saw they were getting an even amount and
shake hands and --

Q   And then all told, what does Moore estimate
that they made from this scheme?

A   All total, his estimate is about a quarter of
a million dollars.

Q   For him and West?

A   For him and West.

Q   Does that include the amount the contractors

THOMAS FIKES

would have kept?

A    Because they were splitting profits evenly again with the contractors, that assumes an additional quarter of a million dollars that the contractors earned.

Q    And this is all paid in cash?

A    Correct.

Q    What do they do with all that money?

A    Initially, they hid it within their quarters until they could get it home, and they chose to mail it home hidden in boxes.  So they'd buy little trinkets, DVDs, and clothing and different items at the little bazaar that was held on base; and they would hide the cash within those items and pack up and mail it home.

Q    Where did they mail it?  Where did Moore mail his money?

A    Moore mailed his to his home here in Chicago.

Q    And what about West?

A    And west mailed his to his friend, Charles Patton.

Q    Did -- did West and Patton communicate about that?

A    They did.  Naturally, Chris West was

THOMAS FIKES

concerned about a lot of cash going through the mail, and so he communicated via email with Charles Patton to coordinate the shipments of the boxes and to verify that they were received.

Q   I think you've got some of those emails with you.

On January 7th, did you find an email from West to Patton written on January 7th?

A   Yes.

Q   What did he say to Patton?

A   Yes.  Part of it says, "Did all four boxes make it?  I sent three boxes today.  The had all kinds of good stuff at the bazaar."  Should have been they.

Q   And what about on January 11th, did you find an email from -- this is 2005.  I'm sorry.

A   Yes.  In this email he's coordinating tracking of the boxes, and he says, "Here are the tracking numbers for the last four boxes."  And he listed out four numbers, I assume are the tracking numbers.

Q   And February 14th, do you see an email from him then?

A   Yep.  He responds to Charles Patton, "Thanks

THOMAS FIKES

for receiving my mail. As always, Chris." And then also, "I received two more boxes, for a total of 11."

Q    Sorry. Who was writing that last one?

A    From Charles Patton.

Q    Charles Patton confirming that he had two more boxes?

A    Right. That he received two more boxes for 11 total.

Q    And did you recover an email from February 18th, 2005, about this?

A    Yes. From Charles Patton to Christopher West, and he reports, "We have a grand total of 14."

Q    How was West mailing the boxes? By what -- by what mail service or carrier?

A    DHL.

Q    And was he also using U.S. mail or did he send it exclusively by DHL?

A    I believe so, but the details escape me.

Q    Okay. Where did West keep the money once it got back to the United States?

A    Well, initially it stayed in the boxes at his friend's house, Charles Patton's house, until he was able to come home on leave. At that point, he, you know, revealed to Patton and to his wife all this

THOMAS FIKES

cash.

And he entrusted to his wife, Angie West, to take that cash and put it in their safe deposit box at the Northern Trust Bank.

Q    Okay.  And have you seen records from the Northern Trust Bank about those safe deposit boxes?

A    Yes, I have, reviewed entry records suggesting her accessing the box during that time frame.

Q    Have you spoken with Angela West about that also?

A    I have, and she's corroborated that story that she put the money into the box that Chris had request.

Q    On -- in sometime in January of 2005, did Moore, have you seen evidence that Moore mailed a package home via DHL?

A    Received a copy of a receipt for a package that he had shipped.

Q    What happened to that package?

A    That package is what set off this investigation.  It was intercepted in England by U.S. Customs.  It's a random inspection of incoming mail across the boarder.

THOMAS FIKES

So they opened it up, found $13,500, I believe, of undeclared cash; and naturally that raised a flag, and it went on from there.

Q   Did Moore, because of that, realize that he had been sort of caught in the act?

A   Yes.  Customs eventually reported it to the active duty CID agents in Afghanistan to the command there.  CID confronted him with the facts and asked him to explain it.

Q   Did West find out about that incident as well?

A   He did.  Moore made it known as soon as he was able, and as well because the command had been briefed; and because West was Moore's supervisor, he was actually briefed to the fact by the command.

Q   And immediately after he found that out, what did West do?

A   He got back with Angie West and Charles Patton and arranged for his wife, Angie West, to take the money out of the safe deposit box because he was afraid that, you know, there was now going to be an investigation, that they may think to look into his personal accounts or places that he owned.

Q   Where did that money that had been in the

40

THOMAS FIKES

Northern Trust Bank eventually wind up?

A    Eventually Chris West arranged with

Charles Patton to have Charles Patton open a new safe

deposit box at a different bank; and that box was

under Charles Patton's name, but it was for the sole

purpose of storing Chris' money.

Q    What bank was that at?

A    That was Seaway National Bank.

Q    What did they, Patton and West, what

originally went into that box?

A    Charles Patton, as he explained it to us,

received an envelope that contained, I believe it was

between 8 and 10 stacks of money, basically, and they

were wrapped in white writing paper, wrapped up in

the writing paper, 8 and 10 approximately, of the

same thickness.

Q    Have you used -- you mentioned that you've

spoken with Charles Patton and he's agreed to

cooperate with the investigation.  Has he explained

to you where that money is, what happened to the

money, that 8 to 10 bundles of cash?

A    Yes.  So initially there was 8 to 10, and he

said periodically Chris West would approach him and

say, you know, "Hey, we need to go to the Seaway

41

THOMAS FIKES

National Bank. I need to take some of the money
out."

They would go and retrieve the money. West
retained the key to the safe deposit box so, you
know, Patton couldn't go and get money on his own.
They went together, and so they made a number of
withdrawals from the safe deposit box. And I believe
he said it was usually to take out one of the
packages each time, one of the little wrapped stacks.

Q    By the time you spoke with Charles Patton in
August, give or take, of 2008, was there anything
left in that box?

A    There was. With Charles Patton's
cooperation, we went back to the safe deposit box and
inside we found the envelope that he described. And
in it were two remaining stacks of money.

Q    Okay. I'm going to show you some photos.

When you went to the bank, did you or someone
that you went there with take pictures?

A    We did, yes.

Q    Okay. Are these -- show you Grand Jury
Exhibit 21. Is that a picture from the Seaway
National Bank?

A    Yes. That's what we saw when we opened the

42

THOMAS FIKES

box up, the yellow envelope.  We noted it was

addressed to Angela West.

Q    And that's the safe deposit box registered to

Charles Patton?

A    Correct.

Q    Is Angela West's name on the registry for the

safe deposit box?

A    No.  He was -- he was the sole person.

Q    Okay.  Is that you in the picture?

A    That is indeed me.

Q    And looking at Exhibit No. 20.  I'm sorry,

21.

        What's that picture of?

A    So when we opened up that yellow envelope,

that is what we found, these two packages.  You can

see those were the two stacks of money lying on the

paper that they were wrapped inside of.

Q    Okay.  And finally, Exhibit 22?

A    So we proceeded to count it out, see what we

had, and you'll see they're all very new $100 bills,

and I believe it totaled $16,700.

Q    And just an estimate, you may not remember

the exact date, but when was it that you went to the

bank and found this money?

43

THOMAS FIKES

A    It was early September, I believe.

Q    2000 and --

A    Of 2008.

Q    Eight, okay.  Thanks.

All right.  The last time we were here, we talked about the contract awards scheme in a little more detail.  And one of the contracts that we talked about being paid for the award of was an NRO asphalt paving contract.

A    Yes.

Q    And basically you had testified that according to Moore, who I believe at that time was one of the few witnesses in the case, that NRO paid $30,000 in exchange for that asphalt contract.

A    Correct.

Q    Have you learned since then any new information about that $30,000 payment?

A    Yeah, we did.  We learned that it was -- the situation was a little more broadly defined than just that one asphalt contract.  That in fact West did and Moore had arranged with Boyd to assist NRO in any contracts that they could get because they knew NRO was a cooperating company.

Q    And who from NRO have you learned this from,

44

THOMAS FIKES

indirectly?

A    From Bashir.

Q    Okay.  And have you also spoken to

Patrick Boyd about that?

A    Yes.  Patrick Boyd described how, you know,

West approached him and discussed how wanting to make

sure that this was one of the companies that they

wanted taken care of, so --

Q    And did Boyd confirm that he took favorable

contracting action on behalf of NRO?

A    Correct, he did.

BY MR. PLETCHER:

Q    Did Boyd mention any other specific contracts

or the asphalt contract we talked about last time,

were there other specific contracts that NRO held or

was awarded during this time by Patrick Boyd that

were relevant to this 30,000?

A    Well, again the bunkers and barriers, the

renewal of the bunkers and barriers contract, was

relevant to that as well.

Q    Agent Fikes, you had mentioned at one point

that Lieutenant Moore and Major West, their job was

to verify accurately the DD-250s.  That was meant to

be their job in the U.S. military; is that correct?

THOMAS FIKES

A    Yeah.  That's one of the functions they had in the base operations office.

Q    And is that -- that's what their fiduciary duty is to the United States Army is to carry out their job correctly and truthfully?

A    Absolutely.

Q    And if they were not to do that, if they were to falsely certify the receipt of bunkers and barriers, for example, would that be a breach of their fiduciary duty to the U.S. military?

A    Most definitely.

            MS. ALLEN:  I don't have any
            further questions for Agent Fikes,
            but if any of you do, please speak
            now.

            A GRAND JUROR:  It might be
            irrelevant, but I was just
            interested, the major, how much
            they are making for a living.

BY MR. PLETCHER:

Q    If you can answer that.  How much did Lieutenant Moore and Major West make for a living?

A    When they were over there, I couldn't say explicitly.  I'll give you some ballpark figures.

46

THOMAS FIKES

I believe Major West, here back in Chicago,
which we will assume a base pay amount as well as a
locality pay for being in the Chicago area, his base
pay was around $80,000.

So when he was deployed, he should still have
been getting that locality pay, and then he would
also have been receiving some sort of hazardous duty
pay, few other differentials that occur when a
soldier's deployed, you know.  Someone of his rank is
reimbursed reasonably well.

Q    Was Patton making money from -- or was he
getting a kickback?

A    West gave him money for his -- for his
assistance.  I believe the number was around $10,000.

MS. ALLEN:  Any other
questions for Agent Fikes?

We can also answer more
general questions about the
indictment after he leaves.

Thank you.

THE FOREPERSON:  Thank you.

47

THOMAS FIKES

MS. ALLEN:  Thank you,

Agent Fikes.


(WHEREUPON there being no further

questions by the Grand Jurors, the

witness was excused.)


*  *  *  *  *


C E R T I F I C A T E


I, Mary Higginbotham, CSR, do hereby certify

that I reported the proceedings had in the above

matter before the Federal Grand Jury in the Grand

Jury Room in the United States Court House at

Chicago, Illinois, on the 18th of June, 2009, and

that the foregoing is a true and accurate transcript

of said proceedings.

Mary L. Higginbotham, CSR

# Exhibit H

| | |
|---|---|
| 1 | **TRANSCRIBED FROM DIGITAL RECORDING** |
| 2 | IN THE UNITED STATES DISTRICT COURT |
| | NORTHERN DISTRICT OF ILLINOIS |
| 3 | EASTERN DIVISION |

| 4 | UNITED STATES OF AMERICA, | ) | |
| | | ) | |
| 5 | Plaintiff, | ) | |
| | | ) | |
| 6 | vs. | ) | No. 08 CR 669 |
| | | ) | |
| 7 | CHRISTOPHER P. WEST, et al., | ) | Chicago, Illinois |
| | | ) | February 16, 2010 |
| 8 | Defendants. | ) | 1:09 P.M. |

| 9 | TRANSCRIPT OF PROCEEDINGS - Arraignment and Plea |
| | and Oral Argument |
| 10 | BEFORE THE HONORABLE MARTIN C. ASHMAN, Magistrate Judge |

| 11 | APPEARANCES: |

| 12 | For the Government: | U.S. DEPARTMENT OF JUSTICE |
| | | ANTITRUST DIVISION |
| 13 | | 450 5th Street |
| | | Washington, D.C.  20530 |
| 14 | | BY:  MR. W. PLETCHER |
| | | MR. MARK ROSMAN |
| 15 | | MR. MATTHEW LUNDNER |
| | | MS. EMILY ALLEN |
| 16 | | MR. KENNETH W. GAUL |

| 17 | For Defendants AZ and | PAUL HASTINGS JANOFSKY & WALKER LLP |
| | Assad Ramin: | 875 15th Street, N.W. |
| 18 | | Washington, D.C.  20005 |
| | | BY:  MR. KIRBY D. BEHRE |
| 19 | | |

| 20 | For Defendant Tahir | REED SMITH LLP |
| | Ramin: | 10 South Wacker Drive, 40th Floor |
| 21 | | Chicago, Illinois  60606 |
| | | BY:  MR. STEVEN ALAN MILLER |
| 22 | | |

| 23 | PAMELA S. WARREN, CSR, RPR |
| | Official Court Reporter |
| | 219 South Dearborn Street, Room 1928 |
| 24 | Chicago, Illinois  60604 |
| | (312) 294-8907 |
| 25 | **NOTE:  Please notify of correct speaker identification.** |

1    opponent, why do you need all the grand jury testimony, why not

2    just the grand jury testimony that has to do with what this

3    particular defendant said?

4         His answer was, he'll come back and say, well, there

5    is enough other information given to the grand jury.

6         Is that correct?

7         MR. LUNDNER:  No.  The reason is that the law

8    recognizes that grand jury secrecy serves important

9    institutional purposes.  That is why the law places the burden

10   on the defense to show a particularized need for disclosure of

11   grand jury transcripts.  Unless they can make that showing, the

12   purposes that grand jury secrecy serves, one of which, is

13   protecting the integrity of the proceedings.  The fairness of

14   the proceedings remains in place.

15        The burden is on them to make that threshold showing

16   of particularized need.  And here they simply haven't come

17   close to even beginning to show anything of the sort.

18        THE COURT:  No, but you haven't really answered -- you

19   answered my question directly, but the rest of your remarks

20   don't explain that answer.

21        MR. LUNDNER:  I apologize.

22        THE COURT:  My question is if the Court feels that

23   there is sufficient information that indicates that the

24   indictment may be dismissed, and, therefore, information, the

25   balance of the grand jury testimony ought to be shown, what I

1   want to know is if I just restrict them to -- if I agreed with

2   them but restricted them only to information before the grand

3   jury that had to do with the defendants's statements, which is

4   the important thing cited by the defendants here, will you then

5   come back and say, you need -- there is enough other

6   information, even if this is true, and, therefore, the

7   indictment should not be dismissed.  That's what I want to

8   know.

9           MR. LUNDNER:  I think the answer to the question is

10  this.

11          And I would ask one of my colleagues to correct me if

12  I am wrong.

13          I believe that the grand jury transcript that they do

14  have is the only grand jury transcript in which testimony was

15  taken from an agent who was present at the interview of Tahir

16  Ramin after that interview was taken.  All the remaining grand

17  jury material occurred before the interview.  The only grand

18  jury transcript that there can therefore be pertinent to the

19  statement that Tahir Ramin made is the one they already have.

20          THE COURT:  All right.  So they then incorporate this

21  in a motion to dismiss the indictment.  And you then come back

22  and say, well, even if that's true, there is enough other

23  information to -- that the indictment ought to remain.

24          I want to know if that's going to be your stance.

25          MR. LUNDNER:  I don't know that I can make that

1   representation to the Court standing here.

2          THE COURT:  Okay.  Because if you can't, and if the

3   Court feels that there is sufficient, then the Court would be

4   obliged to grant the entire motion and open the whole grand

5   jury testimony to them.

6          MR. LUNDNER:  And again the United States respectfully

7   disagrees because the legal standard on which the parties agree

8   in the briefs --

9          THE COURT:  Yes --

10         MR. LUNDNER:  -- is that the defendants must show

11  particularized need for the grand jury materials to overcome

12  the interest and the secrecy, and they haven't done that.  When

13  all they have is the claim that Agent Fikes likely perjured

14  himself before the grand jury because the content of his

15  testimony in the transcript they do have did not replicate the

16  content of another agent's handwritten notes.

17         That legal -- the legal standard is simply not met.

18         MR. MILLER:  May I be heard?

19         THE COURT:  Yes.

20         MR. MILLER:  Thank you.

21         Excuse me.  Could I --

22         Judge, first of all, I think the government misstates

23  the legal standard, and I'm going to read to you verbatim what

24  we said in our moving papers.  Defendants assert that the

25  discrepancies make it likely that Agent Fikes and perhaps other

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of November 2010, the foregoing DEFENDANTS' MOTION TO DISMISS COUNTS ONE, THREE, TEN, ELEVEN, FOURTEEN AND THE FORFEITURE COUNT OF THE SUPERSEDING INDICTMENT was filed electronically using the ECF system which will send notification of such filing to: counsel for the Government and defendants Christopher West, Patrick Boyd, John Ramin, AZ Corporation, Noor Alam, Northern Reconstruction Organization, Abdul Qudoos Bakhshi, Naweed Bakhshi Company, and material witnesses Ziaulhaq, Bashir Ahmat and Kiomars Rafi.

/s/ Thomas M. Levinson

Steven A. Miller (3125365)
Bradley J. Bolerjack (6273767)
Thomas M. Levinson (6286713)
REED SMITH LLP
10 South Wacker Drive
Chicago, IL 60606-7507
Telephone:    +1 312 207 1000
Facsimile:    +1 312 207 6400
*tlevinson@reedsmith.com*

*Counsel for Defendant Tahir Ramin*

102516372

- 16 -