**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No.: 08 CR 669 |
| vs. ) | |
| ) | Honorable Matthew F. Kennelly |
| CHRISTOPHER P. WEST, et al., ) | |
| ) | |
| Defendants. ) | |

**DEFENDANTS' JOINT RESPONSE TO THE
GOVERNMENT'S MOTION *IN LIMINE* TO BAR DURESS DEFENSE**

Defendants John Ramin, Tahir Ramin, and AZ Corporation ("Defendants"), through their respective counsel, hereby submit their joint response in opposition to the government's Motion *in Limine* to Preclude Evidence or Argument Related to a Duress Defense ("Motion"). (Docket No. 705.) In further support thereof, the Defendants state as follows:

**I.  INTRODUCTION**

The government filed its Motion to preclude evidence and argument concerning a "duress" defense, presumably seeking to bar evidence of *both* economic and physical coercion. The government seeks this extraordinary relief several months before trial and well before it has completed its ongoing obligation to produce documents pursuant to Rule 16, *Jencks*, and Rule 404(b). Moreover, the government's Motion comes before various federal agencies have produced materials that have been ordered pursuant to Rule 17 subpoenas. The government is simultaneously trying to prevent disclosure of evidence while arguing that the Defendants lack sufficient evidence even to present a defense. This is highly unusual and, putting aside the merits, it is premature for the Court to bar any defense.

The Motion also clearly fails on the merits. This Response begins by discussing the prior rulings by Magistrate Judge Ashman and Judge Coar regarding physical and economic coercion, followed by a summary of the evidence and law in support of the Defendants' position. When Magistrate Judge Ashman expressly ruled seven months ago that the Defendants can assert a physical duress, the government did not object, and its failure to do so bars the government from re-asserting the same argument now. Further, the Defendants need only make a minimal showing in order to present a defense and obtain a jury instruction, as a defendant is entitled to have a jury consider a proffered defense so long as that defense has a foundation in the evidence, however "tenuous" that foundation may be, and even if the evidence is "weak, insufficient, or of doubtful credibility." As further set forth below, this minimal showing has been met and exceeded many times over.

## II. PROCEDURAL HISTORY

### A. Physical Duress

More than a year ago, the government moved to preclude evidence, argument and cross-examination regarding physical duress. (Docket No. 356). Judge Coar transferred that motion to Magistrate Judge Ashman for hearing and resolution. (Docket No. 379.) Following extensive briefing and oral argument by the parties, Magistrate Judge Ashman issued a written opinion denying in part the government's motion to exclude. (Docket No. 509.)[1] **Magistrate Judge Ashman held that "Defendants are not precluded from asserting the defense of duress generally, and may assert the defense as to the warlords if they can show the military directed or orchestrated the warlords' attacks or threats upon Defendants."** (Docket No.

---

[1] For the Court's convenience, an electronic copy of all docket entries referenced herein will be included on the CD that will be provided to the Court with the filing of this brief.

509, at 8.) (Emphasis added.) In that same ruling, Magistrate Judge Ashman concluded that evidence of warlords' threats of violence is relevant "if Defendants can show that the military orchestrated or in some way used or conspired with the warlords to carry out threats or violence on its behalf. At oral argument, **both parties agreed that this analysis applies**, and the Court so holds." (Docket No. 509, at 7) (emphasis added); *see also* Feb. 16, 2010 Trans., at 58, attached as Exhibit A. The government did *not* object to Magistrate Judge Ashman's ruling allowing the defense of physical duress, nor did the government object to the magistrate's characterization that evidence of a conspiracy linking the warlords and the military officials at Bagram Air Force Base ("BAF") would be relevant.[2]

### B. Economic Coercion

Contemporaneous with its original motion to bar evidence regarding physical duress, the government also moved to bar economic coercion as a defense. (Docket No. 355). This motion was also transferred to Magistrate Judge Ashman for hearing and disposition. (Docket No. 379.) After briefing and argument, Magistrate Judge Ashman granted the government's motion and issued a blanket order precluding economic coercion as a defense.[3] The Defendants timely objected. (Docket No. 476.)

On October 15, 2010, Judge Coar ruled on the Defendants' objections, significantly narrowing Magistrate Judge Ashman's prior ruling as to economic coercion. The Court began the analysis by recognizing that economic coercion can be a substantive defense to the charged

---

[2] Although the government did not seek review of the magistrate's ruling as to physical duress, Judge Coar began his subsequent opinion on economic coercion by reaffirming the magistrate's "uncontroversial[]" holding that physical duress is a permissible defense. (Docket No. 680, at 3.)

[3] The magistrate's ruling was based primarily on *Dixon v. United States*, 548 U.S. 1 (2006). (Docket No. 462). The Court rejected (or failed to discuss) numerous other cases cited by the Defendants that have found that an economic coercion defense may be viable. (Docket No. 476, at 9-11.)

conduct under the proper circumstances. Although the Court found that the Defendants had not yet presented sufficient evidence to demonstrate the application of the defense, the Court's recognition as to the legal viability of the defense is clear:

> . . . Defendants should be permitted to present evidence showing that they did not act with the intent to corruptly influence an official act. In principle, evidence relevant to that purpose should not be categorically excluded simply because it touches on the topic of extortion or, more broadly, economic coercion. As explained below, however, Defendants do not benefit from this opening – at least not on the grounds thus far asserted – because their proposed evidence fails to disprove the corruptness of their intent.

(Docket No. 680, at 4.)

In explaining why economic coercion can be a substantive defense under the appropriate circumstances, Judge Coar squarely overturned the magistrate's broad reading of *Dixon v. United States*, 548 U.S. 1 (2006). In this regard, the Court found as follows:

> Notably, even *Dixon* does not support Judge Ashman's blanket ban on economic coercion as an affirmative defense to the charged crimes. *Dixon* only holds that, where duress fails to negate intent, it cannot serve as a *substantive* defense. *See* 548 U.S. at 6-8. *Dixon* did not address whether economic duress can ever be asserted as an affirmative defense.

(Docket No. 680, at 9.) (Emphasis in original.)

Judge Coar also partially surveyed the law regarding economic coercion, finding that the Seventh Circuit "has yet to explicitly outline the parameters of a valid economic duress defense in the context of bribery charges . . ." (*Id.*) However, citing numerous opinions of the Seventh Circuit and other circuit courts, the Court found that economic coercion may be a defense to the charged conduct under the proper circumstances. (*Id.*, at 4-5, 9-11.)[4]

---

[4] *See United States v. Toney*, 27 F.3d 1245, 1251 (7th Cir. 1994); *United States v. George*, 477 F.2d 508, 514 (7th Cir. 1973); *United States v. McPartlin*, 595 F.2d 1321, 1340 (7th Cir. 1979); *United States v. Peskin*, 527 F.2d 71, 84 (7th Cir. 1975); *United States v. Barash*, 365 F.2d 395, 401-02 (2d Cir. 1966).

To be sure, Judge Coar did limit the scope of the economic coercion defense in his ruling. Specifically, the Court held that the Defendants are precluded from arguing:

> (a) the mere fact that U.S. servicemen conditioned the award of bunkers-and-barriers contracts on bribes negates Defendant's intent to commit bribery when seeking those contracts, or that (b) evidence of Defendants' intent when responding to other instances of extortion by U.S. servicemen is relevant to their intent when paying the bribes described in the instant indictment.

(Docket No. 680, at 7.)

Yet the limitations outlined in Judge Coar's Order have never been the focus of the defense in this case. Here, to the extent that the government can prove payments were made in the first place, any such payment was not for the purpose of securing the award of a discretionary contract. Rather, AZ had invested millions of dollars in Afghanistan to provide goods and services to the United States military, received numerous awards for its work, and sought an environment of fair dealing based on its performance. The extortion scheme by the corrupt military officials sought to turn this process on its head by threatening to put AZ out of business, including through the termination of lawfully awarded pre-existing contracts and blackballing AZ if it did not comply with the extortion demands.

The corrupt military officials extended their coercive tactics by enlisting warlords to threaten and carry out violence if the Defendants failed to comply with the demands of the corrupt military officials. Thus, economic and physical coercion are inextricably intertwined as part of an overarching scheme by the corrupt military officials to apply pressure on the Defendants. Raising these facts is permissible under Seventh Circuit law and under Judge Coar's ruling, which explicitly distinguished cases where the payments at issue were made as the sole basis for the award of discretionary contracts. The jury should be allowed to evaluate these facts.

### III. ARGUMENT

#### A. The Government's Failure To Object To A Decision Permitting The Physical Duress Defense Bars The Government From Re-Raising That Argument

In his written opinion denying in part the government's motion to exclude, Magistrate Judge Ashman ruled that **"Defendants are not precluded from asserting the defense of duress generally, and may assert the defense as to the warlords if they can show the military directed or orchestrated the warlords' attacks or threats upon Defendants."** (Docket No. 509, at 8.) (Emphasis added.) Magistrate Judge Ashman also concluded that evidence of warlords' threats of violence is relevant "if Defendants can show that the military orchestrated or in some way used or conspired with the warlords to carry out threats or violence on its behalf. At oral argument, **both parties agreed that this analysis applies**, and the Court so holds." (Docket No. 509, at 7) (emphasis added); *see also* Exhibit A.

The government did *not* object to the magistrate's ruling allowing the defense of physical duress, nor did the government object to Magistrate Judge Ashman's characterization that evidence of a conspiracy linking the warlords and the military officials at BAF would be relevant. Indeed, the government makes no mention of Magistrate Judge Ashman's ruling in its current Motion, nor does it claim that the earlier ruling was wrong.

Under the law of the case doctrine, this Court should refuse to reconsider what has previously been decided in this matter. *See Gilbert v. Illinois State Board of Education*, 591 F.3d 896, 902 (7th Cir. 2010); *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005) (quoting *Best v. Shell Oil Co.*, 107 F.3d 544, 546 (7th Cir. 1997)). Indeed, "[i]n situations where a different member of the same court re-examines a prior ruling, the law of the case doctrine . . . reflects the rightful expectation of litigants that a change of judges midway through a case will not mean going back to square one." *Mendenhall*, 419 F.3d at 691 (quoting *Best*, 107

F.3d at 546). Issues should not be reopened absent a strong conviction that the earlier ruling was wrong and the party who benefitted from the earlier ruling would not be unduly harmed. *Gilbert*, 591 F.3d at 902.

> **B.  Defendants Need Only Establish A Minimal Foundation To Defeat The Government's Motion And Receive Jury Instructions On The Defense**

"Duress" or "coercion" may be raised as a defense to federal crimes in one of two ways.[5] First, if the defendant has been charged with a specific intent crime, duress is a substantive defense that negates or otherwise undermines the *mens rea* of the charged offense. *United States v. Toney*, 27 F.3d 1245, 1250-51 (7th Cir. 1994); *see also*, *e.g.*, *United States v. Barash*, 365 F.2d 395, 402 (2d Cir. 1966) (Friendly, J.).[6] "Where coercion is raised as a defense to a specific intent crime, the willfulness and deliberate intention to disregard the law required for a showing of specific intent does not exist if the defendant acted under duress or coercion." *Toney*, 27 F.3d at 1251. When a specific intent crime is charged, so long as a defendant introduces evidence with "some foundation," the burden of proof is on the ***government*** to disprove coercion beyond a reasonable doubt. *See id.*, at 1248.

Presenting an adequate foundation requires only a minimal showing. *United States v. Sawyer*, 558 F.3d 705, 710 (7th Cir. 2009). The Seventh Circuit has recently stated that "[a] defendant is entitled to have a jury consider a proffered defense so long as that defense has a foundation in the evidence, 'however tenuous' that foundation may be." *Id.* (quoting *United States v. Given*, 164 F.3d 389, 394 (7th Cir. 1999)). A jury instruction on a proffered duress

---

[5] The terms "duress" and "coercion" are generally used interchangeably as criminal defenses. *See*, *e.g.*, *United States v. Sawyer*, 558 F.3d 705, 711 (7th Cir. 2009).

[6] Defendants use the term "substantive defense" as shorthand for a "failure of proof" defense, which "puts the prosecution to its burden of proving each element of an offense beyond a reasonable doubt." *See United States v. Jumah*, 493 F.3d 868, 873-74 (7th Cir. 2007).

defense is warranted if there is at least some evidence supporting the defense, even if the evidence is "weak, insufficient, or of doubtful credibility." *Toney*, 27 F.3d at 1251. Indeed, only if no credible evidence supports a proffered defense should a court refuse to submit the defense to a jury. *United States v. Dunkin*, 438 F.3d 778, 780 (7th Cir. 2006). In addition, the availability of a defense "requires the resolution of factual issues, and thus, where a court rules on the availability of a pre-trial motion *in limine*, the trial court must accept as true the evidence proffered by the defendants." *United States v. Tokash*, 282 F.3d 962, 967 (7th Cir. 2002).

Independent of negating the elements of the charged offense, a defendant may also assert duress as an affirmative defense. Where the crime charged lacks a specific intent requirement, duress or coercion operates to excuse or justify the underlying conduct. In such instances, the burden of proving the facts in support of a coercion affirmative defense is on the defendant. *Dixon v. United States*, 548 U.S. 1, 8 (2006); *Toney*, 27 F.3d at 1250-51.

In the Superseding Indictment, the government charged Defendants with bribery, mail fraud, and conspiracy to commit both bribery and mail fraud. (Docket No. 201, Counts 1, 3, 10, 11, 14.) The Seventh Circuit has explicitly characterized bribery and mail fraud as "specific intent" crimes. *See, e.g., United States v. Peleti*, 576 F.3d 377, 383 (7th Cir. 2009) (bribery a specific intent crime); *United States v. Roberts*, 534 F.3d 560, 571 (7th Cir. 2008) (mail fraud a specific intent crime); *United States v. Warner*, 498 F.3d 666, 691 (7th Cir. 2007) (same). In addition, where a defendant is charged with conspiracy, as here, the intent necessary to convict is the same as the requisite intent applicable to the underlying offense that was the object of the conspiracy. *See United States v. Feola*, 420 U.S. 671, 686 (1975).

Thus, under the facts of this case, the duress defense operates as a substantive defense to the specific intent crimes charged. *See*, *e.g.*, *Toney*, 27 F.3d at 1251. In the event that the Court

finds that the charged offenses are not the type of specific intent crimes to which a substantive defense would apply, then the duress defense is treated as affirmative in nature. Under either scenario, the defense is not barred (though that is the relief sought by the government ). The Defendants have grave concerns that the Motion is simply a backdoor attempt to block the Defendants' almost two-year effort to obtain evidence in support of their defense via various Rule 16 discovery requests and Rule 17 subpoenas issued to various federal agencies.[7]

### C. Defendants' Factual Proffer In Support Of Their Duress Defense

Christopher West ("Major West"), an Army Major with the Illinois National Guard 33rd Area Support Group, was deployed to BAF on or around March 29, 2004, and assigned as the "S4," or head of base operations. As such he had a major role in the contracting process and could influence contract awards as well as payments. Acting alongside Major West as Assistant S4 was Lieutenant Robert Moore ("Lt. Moore"), also a member of the Illinois National Guard. Charles Orlanda Finch ("Sgt. Finch"), a sergeant with the United States Army's 725th Logistical Task Force, was deployed to BAF in or about January 2004 and assigned as the Noncommissioned Officer in Charge (NCOIC) of Operations Support, where he served until approximately January 2005. Patrick Boyd ("Sgt. Boyd") was a sergeant deployed to Afghanistan in September 2004 as a contingency contracting officer. He worked closely with Major West and other contracting/logistics personnel.

---

[7] In their letter to the Court dated December 12, 2010, the Defendants have specifically designated the known warlord groups and their affiliates, identified how they are related to the case, and provided more than sufficient information for the government to conduct a thorough search for responsive records. As noted by Magistrate Judge Ashman, the warlords (much like the mafia) do not wear nametags and thus full identification by the Defendants may not be possible in all instances. *See* Aug. 4, 2010 Trans., at 63-64, attached as Exhibit B.

Certain corrupt military officials, including but not limited to those identified above, engaged in extortionate demands against military contractors, including AZ.[8] When West arrived in Afghanistan, he declared that he would not leave without making a million dollars. West's role as the instigator of the bribes, as opposed to the Defendants, was confirmed by the lead prosecutor at West's detention hearing, when the prosecutor informed the Court that West ***"conceived of and orchestrated"*** the charges offenses. *See* Sept. 2, 2008 Trans., at 13, attached as Exhibit C.

Not only did West "conceive of and orchestrate" the conduct at issue in this case, he also organized a crime family of other military personnel to help him carry out his schemes. Prior to return of the indictment there was an undercover phase of the investigation where West was secretly tape recorded by fellow corrupt military officials who were, at that point, cooperating withy the government. On the tapes West describes a crime "family" and holds himself out as leader of the "family." West also describes himself as a "gangster" regularly on the look-out for "shakedown" opportunities.

The evidence will also show that West utilized threats of violence against even the military members of his "family" in order to pressure them to do his bidding. For example, Sgt. Boyd has told investigators that when he resisted West, West took him for a ride around BAF and told him that the beatings and suicides occurring at the base were caused ***by West***. Boyd stated that he bowed to West following these threats of violence. Multiple other military officials have told the government that West routinely bullied and pressured them to engage in wrongdoing.

---

[8] West, Moore, and Boyd have already pleaded guilty to participating in criminal conduct at BAF. Finch is currently under indictment in the District of Hawaii on bribery and money laundering charges for his role in manipulating the line haul contract at BAF.

To aid their extortion scheme, West, Finch and other military officials enlisted local warlords to act as their street muscle against the Defendants and other contractors. Warlords are eager to do the bidding of military officials in charge of contracting and logistics because the warlords operate business that vie for valuable contracts with the U.S. military.[9]

The military officials' collaboration with the violent warlords was made explicit to Defendants in multiple ways. For example, two heavily armed and violent warlords, Enayatullah and his brother, Khowani, controlled the checkpoint gate outside BAF during the relevant time period. Major West informed Tahir Ramin that he worked with Enayatullah and that demands for bribes by West and his crew must be met. Enayatullah, in turn, informed Tahir Ramin that he was working in concert with Major West and that AZ must obey Major West.

Other examples abound. When AZ resisted Sgt. Finch's extortionate demands, armed warlords invaded AZ's offices and violently threatened John Ramin. On another occasion, one of the Ramin Defendants' vehicles was shot at by a local warlord acting at the direction of one or more members of the "family." Previously proffered evidence shows that other warlords and their agents attempted to assassinate John Ramin by shooting at the car in which he traveled.

On numerous other occasions, armed members of the Afghan military who guarded the BAF gates threatened John Ramin and his associates with violence. John Ramin's former bodyguard, Mohaidin, testified about these repeated threats during his September 16, 2010 deposition. (*See* Mohaidin Dep., at 10:11-13, attached as Exhibit F.) In particular, Mohaidin recounted a specific incident in which followers of a well-known warlord fired shots at John

---

[9] Two Congressional Reports have found that the U.S. military has awarded hundreds of millions of dollars of contracts to warlords operating businesses ostensibly to support the U.S. government. *See* "Warlord, Inc." (House report), attached as Exhibit D; "Inquiry into the Role and Oversight of Private Security Contractors in Afghanistan" (Senate report), attached as Exhibit E. Also, in documents produced in this case by the government for the first time on January 3, 2010, there are contracts between the military and at least one of the warlords. Certain of these documents also show a direct link between West and the named warlord.

Ramin. Mohaidin identified Sgt. Finch as implicated in that attempted shooting: Finch was "the guy, he was threatening him and he was – he's the one suggested to fire on [John Ramin] . . ." (*Id*. at 11:7-14).

On another occasion, Enayatullah ordered Tahir Ramin's vehicle off the road at gunpoint near BAF and told Tahir that AZ must obey West and those acting in concert with West. For his part, Sgt. Finch expressly acknowledged the influence of another warlord, Baba Jan, in connection with Finch's own demands for payoffs. These facts are supported by 302 interview reports that recount Sgt. Finch telling his wife that he worked with warlords at BAF.

In another instance in which "family" members combined threats of physical violence with economic coercion, Sgt. Finch unlawfully terminated AZ from a military line haul contract AZ had already legally obtained for refusal to pay bribes as demanded. HEB and other contractors were brought in to replace AZ. Shortly after, multiple warlords acting in concert with Finch invaded AZ headquarters with armed men to threaten John Ramin for sublease of AZ assets to enable HEB to perform the contract.

Defendants complained about these activities, to no avail. Specifically, complaints were made in the 2003-2005 time period to Joshua M. Basse, who used the email address joshua.m.basse@afghan.swa.army.mil. Complaints were also made to Alicyn Basse, who used the email address alicyn.k.basse@afghan.swa.army.mil. In their communications with the Ramin Defendants, the Basses represented that they were agents of the Central Intelligence Agency. Additional complaints were made to Army Criminal Investigation Division Special Agent John Fields in July 2005. In the same general time period, after AZ's legally obtained line haul contract was unlawfully terminated because AZ refused military officials' bribe demands, the Ramin Defendants specifically complained to a Major Rogers about being extorted. The

Ramin Defendants made still more complaints to General Eikenberry, among numerous other military officials, about the activities of other warlords and militia groups active at and around BAF. In addition, when Tahir Ramin was interviewed by law enforcement authorities on the date of his arrest, the handwritten interview notes reflect that he described the military shakedown scheme as "like extortion." *See* Aug. 25, 2008 Interview Notes of Agent John Todd, at 4, attached as Exhibit G.

### D. Defendants' Duress Defense Is Valid And Should Be Presented To The Jury

Disregarding all of this evidence, the government argues that, ***as a matter of law***, Defendants' "24/7 fear of death" "in an inherently dangerous and lawless environment" amounts to at most a "generalized or speculative fear of death" insufficient to establish a valid duress defense. (Motion, at 8.) According to the government, Defendants thus cannot satisfy the "impending serious bodily threat" element. The government ignores that once the corrupt military officials served notice they had joined forces with violent and heavily armed warlords, and vice versa, fear of death was neither speculative nor generalized, particularly when coupled with the actual threats and violence outlined above. Once any evidence is presented, it is for a jury to decide the issue, and not for the Court to preemptively bar evidence and cross examination of the corrupt military personnel.

In support of its argument, the government cites several Seventh Circuit opinions in which the court concluded that an asserted duress defense failed as a matter of law. (Motion, at 8-9.) The government's cited cases lack the facts so prevalent here: there are no repeated complaints to the authorities; there are no threats that if a defendant did not perform a specific

act, the defendant would be subject to imminent and serious bodily injury; and there is no actual violence close in time to the alleged unlawful conduct.[10]

The government ignores that in the factual context of this case, the military officials who were supposed to protect contractors performing valuable work for the military instead turned on them and enlisted violent militia groups to carry out their extortionate demands. Under these circumstances, "a person of reasonable firmness in his situation would have been unable to resist." *See United States v. Bailey*, 444 U.S. 394, 412 (1980).[11]

The government also argues that Defendants fail to provide evidence that they had a reasonable, legal alternative to violating the law, like "seeking intervention of the authorities." (Motion, at 9.) According to the government, Defendants never notified the authorities about the extortion scheme, or the threats made against them of severe violence and death, or the active conspiracy linking warlords and military officials. (*Id.*, at 11, 13, 14.) As set forth above at pages 12-13, the government is simply wrong about these facts. Defendants present evidence of numerous unproductive complaints to law enforcement. The Court is required to accept the Defendants' factual proffer as true in resolving this Motion. *See Tokash*, 282 F.3d at 967.

---

[10] *See, e.g., United States v. Harvey*, 516 F.3d 553, 555, 557 (7th Cir. 2008) (affirming sentence of felon in possession of firearm and rejecting duress defense where the defendant failed to demonstrate a reasonable belief that a specific threat was about to be carried out and "never asserted that he was aware of any specific danger at the time he possessed the gun"); *Tokash*, 282 F.3d at 966 (affirming conviction and pre-trial exclusion of duress defense where the defendants – who claimed they concealed weapons in their rectal cavities out of a speculative fear of racially motivated violence – could point to no specific threats made at or near the time of their unlawful conduct, or any identifiable assailants, or any causal relationship between their unlawful conduct and the coercion they claimed to be under); *Sawyer*, 558 F.3d at 712 (affirming conviction and district court's refusal to instruct the jury on duress defense where the defendant's fear of a drug dealer pursuing an unpaid debt was not "present, immediate, or impending" such that she was entitled to a duress defense and where the defendant failed to inform the police and failed to present any evidence that the drug dealer was in fact part of a larger gang or that the gang's purported infiltration of local law enforcement rendered any complaints futile and self-defeating).

[11] Ironically, the prosecution in this case sought to bar depositions from being held in Afghanistan because of the danger to their lives, despite the fact they would be protected by the military. For the Defendants, the fear was of both the military and the warlords.

In addition, the government relies on *Dunkin* to support its proposition that "the duration of the alleged criminal activity alone defeats this proposed duress defense as a matter of law." (Motion, at 14.) That reliance is misplaced, as contrary to the Motion's claim, *Dunkin* does not state that "the duration of the alleged criminal activity" is decisive as to a duress defense's validity. Rather, the duress defense in *Dunkin* failed as a matter of law because five years passed without the defendant even once seeking the authorities' help.

> An essential element of the defense is that the defendant had no alternative to submitting to the demand that he commit a crime. Five years gave Dunkin ample alternatives. In particular, he could have complained to the police immediately after the 1998 robbery, for there is no suggestion that Big Ripple and his associates were holding Dunkin's mother hostage then. Or for that matter after the first of the 2003 robberies.

*Id.*, at 780. (Internal citations omitted.) *Dunkin* therefore suggests that had the defendant complained after the first 2003 robbery – even five years after the first robbery – he would have presented some evidence of having had "no reasonable alternative." While the defendant in *Dunkin* never notified the authorities about the alleged coercion, the Ramin Defendants made numerous complaints to multiple military officials during the 2003–2006 time period.[12]

### E. The Motion Is Premature And Overbroad To The Extent It Bars Potential Cross-Examination And Relevant Evidence And Argument At Trial

The government's request that this Court order a categorical bar of evidence, examination, and argument regarding duress, if granted, would arguably bar the defense from cross-examining the various military officials who have pleaded guilty about their own criminal activity, especially their extortionate activities directed against Defendants and their lies to the

---

[12] The argument that Defendants should be barred from raising their duress defense to the jury because they occasionally left the coercive environment is a red herring. As the government acknowledges, "leaving the environment" is simply one of several "reasonable, legal alternatives" contemplated in a duress defense. (*See* Motion, at 9.) One of those reasonable alternatives is seeking the help of authorities. *See*, *e.g.*, *Sawyer*, 558 F.3d at 712. Indeed, the government concedes that the "no reasonable alternative" element is satisfied with some foundational evidence that a defendant has sought the help of the authorities. (Motion, at 9-10.) Defendants have provided that foundation here.

government in describing that illegal activity. To bar this defense and all potential cross-examination – months before trial is scheduled to start, before federal agencies begin returning records pursuant to Defendants' subpoenas, before the return of *Jencks* materials, and before the admissibility of Rule 404(b) evidence is ruled on – would violate Defendants' constitutional rights by excluding relevant and material evidence, preventing Defendants from presenting a defense, and precluding them from confronting witnesses against them.[13]

## IV. CONCLUSION

WHEREFORE, Defendants respectfully request that the Court DENY the Motion and permit Defendants to obtain evidence, make argument, and conduct examination on their proffered duress defense.

DATED: January 3, 2011

| | |
|---|---|
| Respectfully submitted, | Respectfully Submitted, |
| /s/ Kirby D. Behre | /s/ Bradley J. Bolerjack |
| Kirby D. Behre<br>Paul, Hastings, Janofsky & Walker LLP<br>875 15th Street, NW<br>Washington, DC 2001<br>(202) 551-1700 | Steven A. Miller<br>Bradley J. Bolerjack<br>Thomas M. Levinson<br>REED SMITH LLP<br>10 South Wacker Drive, Suite 4000<br>Chicago, IL  60606<br>(312) 207-2411 |
| *kirbybehre@paulhastings.com* | *bbolerjack@reedsmith.com* |
| *Counsel to John Ramin* | *Counsel to Tahir Ramin* |

---

[13] *See*, *e.g.*, *Webb v. Texas*, 409 U.S. 95, 98 (1972) (citation omitted); *United States v. Davis*, 772 F.2d 1339, 1348 (7th Cir. 1985). Evidence is relevant if its exclusion leaves a chronological and conceptual void in the story of the case. *United States v. Woolsey*, 535 F.3d 540, 549 (7th Cir. 2008); *United States v. Bailey*, 510 F.3d 726, 737-38 (7th Cir. 2007).

**CERTIFICATE OF SERVICE**

     I hereby certify that on January 3, 2011, I electronically filed the attached DEFENDANTS' JOINT RESPONSE TO THE GOVERNMENT'S MOTION *IN LIMINE* TO BAR DURESS DEFENSE with the Clerk of the Court using the court's ECF system, which will send notification of said filing to the following:

Charles J. Aron
chuckaron@earthlink.net

Keri Ambrosio
keri@ambrosiolegal.com

Matthew Joseph Madden
matthew_madden@fd.org

Michael James Falconer
mfalconer@prodigy.net

Pretrial Services
ilnptdb_Court_Action_Notice@ilnpt.uscourts.gov

Emily W Allen
emily.allen@usdoj.gov

Andrea Gambino
agambinolaw@gmail.com

Robert G. Clarke
prestidigitate@sbcglobal.net

J. Clifford Greene, Jr.
jcliffordgreene@msn.com

United States Attorney's Office
USAILN.ECFAUSA@usdoj.gov

Kirby D. Behre
kirbybehre@paulhastings.com

Mark W Pletcher
mark.pletcher@usdoj.gov

    By:   *s/ Thomas M. Levinson*
        Steven A. Miller (3125365)
        Bradley J. Bolerjack (6273767)
        Thomas M. Levinson (6286713)
        REED SMITH LLP
        10 South Wacker Drive
        Chicago, IL 60606-7507
        Telephone: +1 312 207 1000
        Facsimile: +1 312 207 6400
        *tlevinson@reedsmith.com*

        *Counsel for* Defendant Tahir Ramin

105240474